IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHARON MOTLEY,                    )
                                  )
        Plaintiff,                )
                                  )
    v.                            )    CASE NO. 2:19-CV-478-WKW
                                  )              [WO]
HAL TAYLOR, in his official       )
capacity as Secretary of the Alabama )
Law Enforcement Agency,           )
                                  )
        Defendant.                )

## MEMORANDUM OPINION AND ORDER

### TABLE OF CONTENTS

I.      INTRODUCTION — 3

II.     JURISDICTION AND VENUE — 4

III.    STANDARD OF REVIEW— 4

IV.     BACKGROUND — 6

        A.    Alabama's Driver's License-Suspension Scheme — 6

              1.    *Receiving a Traffic Ticket* — 6

              2.    *The State's Changes to the Traffic Ticket System* — 7

              3.    *Courts' Authority to Impose Fines and to Suspend Licenses* — 8

                    a.    Courts' Authority to Impose Fines — 8

                    b.    Courts' Authority to Suspend Driver's Licenses — 9

        4.    *Implementing Court-Ordered Suspensions* — 9

    B.    <u>Plaintiff Sharon Motley</u> — 11

    C.    <u>The Claim</u> — 11

V.    DISCUSSION — 13

    A.    <u>Distinguishing Plaintiff's Legal Theories</u> — 14

    B.    <u>The Nature of a Bearden Claim</u> — 18

    C.    <u>Mootness</u> — 22

    D.    <u>Statute of Limitations</u> — 27

    E.    <u>Laches</u> — 39

    F.    <u>The Merits</u> — 49

        1.    *Equal Protection* — 49

            a.    Heightened Scrutiny — 50

                i.    *Jones* Step 1 — 51

                ii.    *Walker's* "Absolute Deprivation" Test (*Jones* Step 1.5) — 59

            b.    Rational Basis Review — 62

        2.    *Procedural Due Process* — 69

            a.    Notice — 71

            b.    Opportunity to be Heard — 73

VI.    CONCLUSION — 78

# I. INTRODUCTION

Plaintiff Sharon Motley is one of an estimated twenty-three thousand Alabamians whose licenses are suspended for failing to pay traffic tickets. She regularly faces difficult choices about how she will secure and retain employment, apply for housing, cash checks, and access medical care. Before the court are Plaintiff's motions for class certification (Doc. # 5) and for a preliminary injunction (Doc. # 3), which seek to put herself and similarly situated Alabamians back in the driver's seat. Defendant's motion to dismiss the complaint (Doc. # 14) seeks to maintain the State's policy choice to keep these drivers off the road until their debts to the public fisc are paid. While the burdens Plaintiff bears are substantial, the Constitution does not provide her relief. Therefore, Defendant's motion to dismiss is due to be granted, and Plaintiff's motions are due to be denied as moot.

Plaintiff seeks a preliminary injunction (Doc. # 3) to prohibit Defendant Hal Taylor, head of the Alabama Law Enforcement Agency (ALEA),[1] from enforcing an Alabama rule that authorizes state courts to suspend indigent individuals' driver's licenses without finding that they willfully refused to pay. Plaintiff's preliminary injunction motion further seeks to require the State to reinstate licenses suspended under this rule and to notify affected individuals. Finally, Plaintiff moves to certify

---

[1] Because Plaintiff sues Mr. Taylor in his official capacity, the court will refer to Mr. Taylor as "Defendant" or "the State."

a class of similarly situated individuals.  (Doc. # 5.)  The State moved to dismiss

(Doc. # 14) on procedural and jurisdictional grounds, as well as on the merits.  This

opinion addresses those motions.

## II.  JURISDICTION AND VENUE

Because this case involves a constitutional challenge to state actions, subject

matter jurisdiction is proper under 28 U.S.C. § 1331 (federal question).  The parties

do not dispute personal jurisdiction or venue.

## III.  STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the

sufficiency of the complaint against the legal standard set forth in Rule 8: 'a short

and plain statement of the claim showing that the pleader is entitled to relief.'"

*Wilborn v. Jones*, 761 F. App'x 908, 910 (11th Cir. 2019) (per curiam) (quoting Fed.

R. Civ. P. 8(a)(2)).  "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Id.*  This standard "is not

akin to a 'probability requirement,' but it asks for more than a sheer possibility that

[the] defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "For

purposes of Rule 12(b)(6) review, . . . a court generally may not look beyond the pleadings." *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015). This court has adhered to this rule, except that it has considered two specifically identified facts that are properly the subject of judicial notice. *See infra* pp. 28–30 & n.11, 55 n.15.

The State challenges the court's subject matter jurisdiction by arguing that the case has been mooted by a subsequent revision to the statewide traffic ticket. An attack on subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) may be either a facial attack or a factual attack. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990) (per curiam). A facial attack simply challenges the sufficiency of the plaintiff's jurisdictional allegations, which are taken as true. *Id.* at 1529. Factual attacks challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). Defendant brings a factual attack on jurisdiction that requires the court to look beyond the allegations of the complaint and to the evidence presented by the parties. *See MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1319 (11th Cir. 2019). Thus, in deciding the mootness issue raised by Defendant's motion, the court has reviewed all the evidence presented by the parties. Accordingly, the facts recounted and documents referenced in Parts

IV.A.1. and 2. are considered solely for the purposes of deciding the 12(b)(1) motion.

## IV. BACKGROUND

### A. <u>Alabama's Driver's License-Suspension Scheme</u>

#### 1. *Receiving a Traffic Ticket*

Alabama police officers are required by statute to use a uniform traffic ticket. *See* Ala. Code § 12-12-53(a). That statute is implemented by Alabama Rule of Judicial Administration 19(A), which the Alabama Supreme Court promulgates. Rule 19(A) provides what each traffic ticket must contain and includes the standard ticket form, called Form UTTC-1. Form UTTC-1 (Series N) was the standard traffic ticket throughout the state when Ms. Motley received her ticket in 2013. (Doc. # 7-20, at 2–3; Doc. # 1, ¶ 33, at 9.)[2]

The Series N ticket has a section entitled "NOTICE," which gives "INSTRUCTIONS TO THE DEFENDANT." The notice states that the defendant must appear in court on a given date unless he or she has already settled the case. It states that if the defendant fails to appear, the Department of Public Safety will be notified to suspend his or her license. (Doc. # 7-20, at 14.) Series N does not give

---

[2] All citations to the record refer to the CM/ECF page numbers in the heading of each document.

notice that defendants who fail to pay their fines are subject to license suspension. (Doc. # 7-20, at 3, 14.)

### 2. *The State's Changes to the Traffic Ticket System*

On January 26, 2018, the Standing Committee on the Alabama Rules of Judicial Administration recommended that the Alabama Supreme Court amend Rule 19(A) and the UTTC-1 ticket to include language notifying individuals who received traffic tickets that their licenses are subject to suspension for failure to pay fines or to enter into court-approved payment plans. On May 9, 2018, the Alabama Supreme Court entered an order amending Rule 19(A) to include the Standing Committee's proposed language. (Doc. # 7-20, at 3.)

On August 10, 2018, the Standing Committee recommended that the court adopt an updated Form UTTC-1 that includes: (1) the new notice language already approved by the court and (2) several corrective changes, such as replacing references to the "Department of Public Safety" with the "Alabama Law Enforcement Agency." Form UTTC-1 (Series P) contains the additional notice language approved by the court in the amendments to Rule 19(A). (Doc. # 7-20, at 4.)

Form UTTC-1 (Series P) was approved by the Alabama Supreme Court on November 30, 2018. (Doc. # 7-20, at 4.) Series P is now the operative uniform traffic ticket in Alabama.

### 3.    Courts' Authority to Impose Fines and to Suspend Licenses

### a.    Courts' Authority to Impose Fines

Alabama Rule of Criminal Procedure 26.11 (the "Rule") governs fines and restitution orders in state courts.[3]  Rule 26.11(b) provides that courts, in deciding whether to impose a fine, "*should* consider" five factors, including "the financial resources and obligations of the defendant and the burden that payment of a fine will impose," as well as the "ability of the defendant to pay a fine forthwith on an installment basis or on other conditions to be fixed by the court."  Ala. R. Crim. P. 26.11(b)(2), (3) (emphasis added).  If the defendant cannot pay the fine "immediately after pronouncement of the sentence as preferred, the court may permit payment . . . at some later date, or in specified installments."  Ala. R. Crim. P. 26.11(d).

If the defendant fails to pay a fine, the court "*may* inquire and cause an investigation to be made into the defendant's financial, employment, and family standing, and the reasons for nonpayment of the fine," including whether nonpayment "was contumacious or due to indigency," — that is, whether the defendant willfully chose not to pay or was simply too poor.  Ala. R. Crim. P. 26.11(g) (emphasis added).  The words *should* and *may*, when read in their ordinary

---

[3] "Rule 26.11 is taken from the ABA Standards for Criminal Justice, *Sentencing Alternatives and Procedures* 18-2.7 (2d ed. 1986)."  Ala. R. Crim. P. 26.11 committee comments.

sense, mean that courts are not required to consider the indigency of the defendant in deciding whether to impose a fine or in determining why a fine has not been paid.[4]

### b. Courts' Authority to Suspend Driver's Licenses

"If the court orders a defendant to pay a fine and/or restitution imposed as a result of a traffic infraction, the court may suspend the defendant's privilege to operate a motor vehicle in this state upon a failure of the defendant to comply with the order of the court" — that is, when the defendant fails to pay the fine. Ala. R. Crim. P. 26.11(i)(3). And "[i]f the defendant's privilege to operate a motor vehicle has been suspended for failure to comply with such court order, the privilege may remain suspended until the total amount of the fine and/or restitution imposed is paid." *Id.*; (*see also* Doc. # 1, ¶ 18 n.10, at 6 ("Although the Rule talks about 'fine and/or restitution imposed as a result of a traffic ticket,' the majority of traffic tickets in Alabama do not result in restitution. Even Defendant's own policy statement references only unpaid 'fines and court costs.'" (citation omitted).)

### 4. Implementing Court-Ordered Suspensions

To effectuate a license suspension, the court sends a form, called a UTC-25, to the Alabama Law Enforcement Agency ("ALEA").[5] (Doc. # 1, ¶ 26, at 7–8.)

---

[4] The parties have not cited, and the court has not found, an Alabama case construing the language in Rule 26.11(b) as mandatory.

[5] ALEA includes the Department of Public Safety and the State Bureau of Investigations. *See* Ala. Code § 41-27-1.

"Form UTC-25 authorizes judges to order the suspension of a driver's license for nonpayment after making a finding that a motorist was ordered to pay a fine, court costs and/or restitution and failed to pay." (Doc. # 1, ¶ 29, at 8 (citation and internal quotation marks omitted).) ALEA then mails a notice to the defendant that his or her license has been suspended. "The Suspension Notice states that the motorist's driver's license will remain suspended for an 'indefinite' duration until he or she pays 'the outstanding fine and/or court costs,' the court mails Form UTC-25 to ALEA as proof of payment, and the motorist pays a $100 reinstatement fee." (Doc. # 1, ¶ 31, at 8–9 (citation omitted).) "The letter does not provide motorists with any notice about the possibility of a hearing to contest the suspension because the motorist is indigent and unable to pay." (Doc. # 1, ¶ 31, at 9.)

Defendant Hal Taylor, as head of ALEA, is tasked with administering and enforcing the laws governing motor vehicles in the state. *See* Ala. Code §§ 32-2-5, 41-27-2(a). "He establishes general policies and oversees the actions of the agency, including those related to driver's license suspensions." (Doc. # 1, ¶ 24, at 7.) ALEA's written "policy documents state that '[i]t is the policy of the Director and the Driver License Division [of ALEA] that any person' who 'fails to pay' will have their [sic] driver's license 'suspended until . . . the fines and court costs have been paid.'" (Doc. # 1, ¶ 25, at 7 (citation and internal quotation marks omitted).)

**B.**    **Plaintiff Sharon Motley**

Plaintiff Sharon Motley lives in Montgomery, Alabama. Her license is currently suspended for failing to pay "a traffic ticket that she received in the Montgomery County District Court in 2013." (Doc. # 1, ¶ 33, at 9.)[6] Ms. Motley claims that she cannot afford to pay her ticket and that, for this reason only, her driver's license remains suspended. (Doc. # 1, ¶ 33, at 9.) This suspension has made it difficult for Ms. Motley to secure and retain employment, apply for housing, cash checks, and obtain medical care. (Doc. # 1, ¶¶ 35–36, at 9.)

**C.**    **The Claim**

On July 3, 2019, Plaintiff filed this lawsuit, alleging that the State's suspension of her license violates the Fourteenth Amendment's guarantees of due process and equal protection. (Doc. # 1, at 13, 15.) Her brief in response to Defendant's motion to dismiss explains that her claim is founded on the doctrine of *Bearden v. Georgia*, 461 U.S. 660 (1983), and its associated cases. *Bearden* held that, before ordering imprisonment for failure to pay a fine, a sentencing court must determine whether an indigent probationer willfully refused to pay and, if his inability to pay was through no fault of his own, must consider alternative measures of punishment. *Id.* at 672.

---

[6] Oddly, Ms. Motley does not plead the date of the suspension.

"Due process and equal protection principles converge" to protect indigent defendants from imprisonment solely because of their inability to pay fines. *Id.* at 665. The principle that the states must provide "equal justice for poor and rich, weak and powerful alike," *Griffin v. Illinois*, 351 U.S. 12, 16 (1956), "has not been confined to cases in which imprisonment is at stake," *M.L.B. v. S.L.J.*, 519 U.S. 102, 111 (1996). Plaintiff seeks to extend *Bearden* to protect indigent persons from having their driver's licenses suspended without a finding that they willfully failed to pay.

Plaintiff's claim, brought on behalf of all similarly situated persons, is based on the State's suspension of their driver's licenses under Rule 26.11(i)(3) "without prior notice, the opportunity to be heard, and an express finding that the individual is able to pay and willfully failed to do so." (Doc. # 1, ¶ 56, at 14.) She alleges that "[n]either the [Montgomery District C]ourt nor ALEA gave her notice that her driver's license could be suspended for nonpayment, that her ability to pay is a critical issue in determining the appropriateness of suspension or conducted an ability to pay hearing prior to the suspension." (Doc. # 1, ¶ 34, at 9.) Plaintiff seeks a declaration that "that Rule 26.11(i)(3) of the Alabama Rules of Criminal Procedure violates the Equal [P]rotection and Due Process Clauses of the Fourteenth Amendment by suspending a motorist's driver's license for nonpayment without prior notice, the opportunity to be heard, and an express finding that the motorist is

able to pay and willfully failed to do so." (Doc. # 1, at 15.) Plaintiff also seeks to:
(1) enjoin ALEA from suspending licenses under Rule 26.11(i)(3) for nonpayment,
(2) require ALEA to reinstate licenses that were suspended for nonpayment
(assuming there is no other reason for suspension) without charging a reinstatement
fee, and (3) require ALEA to provide notice to the drivers who are eligible to have
their licenses reinstated. (Doc. # 1, at 15.) This court dismissed a previous attempt
to bring this claim because the named plaintiffs (including Ms. Motley) lacked
standing to challenge their suspensions where their licenses were suspended for a
secondary reason that was not redressable by the court. *See Cook v. Taylor*, No.
2:18-cv-977-WKW, 2019 WL 1938794 (M.D. Ala. May 1, 2019).

## V. DISCUSSION

In its motion to dismiss, Defendant argues that all of Plaintiff's claims are
mooted by the implementation of the Series P traffic ticket, that the statute of
limitations has run on all claims, and that all claims are barred by laches.
Additionally, Defendant challenges the merits of Plaintiff's claims under both equal
protection and procedural due process frameworks.

One issue can be disposed of at the threshold. Defendant originally argued
that the *Rooker-Feldman* doctrine barred Plaintiff's claims. (Doc. # 16, at 18–21.)
Plaintiff clarified that she was only bringing facial claims to Rule 26.11(i)(3) and
not an as-applied challenge to her suspension order. (Doc. # 21, at 22–24.)

Defendant then conceded that these facial claims are not barred by *Rooker-Feldman*. (Doc. # 22, at 8–10.)  The court agrees, so this issue warrants no further discussion.

## A.    Distinguishing Plaintiff's Legal Theories

While Plaintiff has pled a single claim for relief, that claim references five distinct injuries that rely on legal theories of either equal protection or procedural due process.  Four of these injuries are intertwined with each other because they are founded on the *Griffin/Bearden* line of cases, which allows Plaintiff to seek relief through one hybrid equal protection/due process theory.  The equal protection component of this theory is a necessary condition for a *Bearden* claim.  Plaintiff adequately alleges such a component by claiming that "Alabama Rule of Criminal Procedure 26.11(i)(3) violates Plaintiff's rights under the Fourteenth Amendment to the U.S. Constitution by authorizing courts to suspend any motorist's driver's license for nonpayment of fines, restitution and/or court costs without . . . considering the reason for nonpayment[] and without determining if the motorist willfully refused to pay." (Doc. # 1, ¶ 60, at 14.)  Assuming this principle to govern, Plaintiff alleges that Defendant's enforcement of Rule 26.11(i)(3) violated her Fourteenth Amendment procedural due process rights and injured her in three ways: 1) that "[n]either the court nor ALEA gave her notice . . . that her ability to pay is a critical issue in determining the appropriateness of suspension" 2) that "[n]either the court nor ALEA . . . conducted an ability to pay hearing prior to the suspension," and

3) that her license has been suspended without a finding that she had the ability to pay.[7]  (Doc. # 1, at 9.)  She argues that Rule 26.11(i)(3) is facially unconstitutional because it authorizes suspensions without requiring the State to provide these protections.  Whether these procedural due process injuries can constitute grounds for relief depends upon whether Plaintiff prevails on her equal protection argument, because if the State was not required to consider Plaintiff's reason for nonpayment, then Plaintiff cannot be entitled to procedures that enable her to assert her indigence. Therefore, these arguments constitute one blended *Bearden* claim because they depend upon an allegation that the "State is treating the indigent and the non-indigent categorically differently."  *Walker v. City of Calhoun*, 901 F.3d 1245, 1260 (11th Cir. 2018).

Despite Plaintiff's protest that "there is no separate procedural due process claim," (Doc. # 21, at 13), Plaintiff alleges that Defendant's enforcement of Rule 26.11(i)(3) violated her procedural due process rights and injured her in in a manner that is unrelated to her *Bearden* claim: "[n]either the court nor ALEA gave her notice that her driver's license could be suspended for nonpayment."  (Doc. # 1, ¶ 34, at 9.) She argues that Rule 26.11(i)(3) is facially unconstitutional because it authorizes suspensions without requiring the State to give *individual* notice of this possibility.

---

[7]  The third injury is stated in the subheading for Part IV.D. of the complaint.  (Doc. # 1, at 9.)  The court assumes, without deciding, that Plaintiff adequately alleged that she suffered this injury.

This notice injury supports a pure procedural due process claim, not a *Bearden* claim, because Plaintiff could obtain relief under this theory even if the Equal Protection Clause does not require the State to consider Plaintiff's reasons for nonpayment. Plaintiff's complaint and briefing repeatedly attempt to conflate her two notice injuries by alleging that "Rule 26.11(i)(3) of the Alabama Rules of Criminal Procedure violates the Equal [P]rotection and Due Process Clauses of the Fourteenth Amendment by suspending a motorist's driver's license for nonpayment without prior notice . . . ." (Doc. # 1, at 15; *see also, e.g.*, Doc. # 1, at 1, 6, 10, 11, 14; Doc. # 21, at 13, 24.) Even under Plaintiff's broad definition of a *Bearden* claim, this notice failure is not an "adverse consequence" imposed "against indigent defendants solely because of their financial circumstances." (Doc. # 21, at 9.)

Plaintiff appears to recognize that this notice injury is separate from the notice injury underlying her *Bearden* claim. (*See* Doc. # 21, at 15 ("Defendant argues that the State is not legally required to provide individual notice because Motley had statutory notice that her license could be suspended for nonpayment. Such statutory notice, however, is inadequate if Plaintiff prevails on her claim that it violates the Fourteenth Amendment to suspend a license unless a driver willfully failed to pay . . . ." (citation omitted)).) The clearest evidence that these legal theories are separate is in Plaintiff's discussion of *Turner v. Rogers*, 564 U.S. 431 (2011). Plaintiff quotes *Cleveland v. City of Montgomery* for its finding that "*Turner*

expanded on *Bearden* by defining an indigent person's due process rights under the Fourteenth Amendment when facing civil contempt . . . includ[ing] (1) notice to the defendant that his ability to pay is a critical issue in the contempt proceedings; . . . ." (Doc. # 21, at 13 (quoting *Cleveland v. City of Montgomery*, No. 2:13-CV-732-MHT, 2014 WL 6461900, at *4 (M.D. Ala. Nov. 17, 2014).)[8]

Plaintiff's choice to plead a single claim for relief adds unnecessary confusion to this case. But because her claim for relief arises from a single transaction—the suspension of her driver's license for nonpayment of traffic fines—Plaintiff is not required to amend her complaint to separate this theory into an additional count. *See* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count . . . ."); Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1247 (11th Cir. 2004) ("While it may well be preferable to plead different theories of recovery in separate counts, it is not required."); *Cole v. United States*, 846 F.2d 1290, 1293–94 (11th Cir. 1988) (acknowledging the existence of two legal theories within Plaintiff's

---

[8] As explained in Part V.F.1.a.i., the court does not share Plaintiff's belief that *Turner* expands *Bearden* to the civil contempt context.

single count and analyzing their merits separately).  However, distinguishing this legal theory from Plaintiff's *Bearden* hybrid theory has important ramifications for the disposition of Defendant's jurisdictional and procedural objections.  *See also infra* note 12 (finding, in the alternative, that even if Plaintiff were required to separate these theories into two counts, amending the complaint would be futile).

**B.**    **The Nature of a *Bearden* Claim**

To understand the jurisdictional and procedural issues, it is helpful to first understand the curious nature of a *Bearden* claim.  *Bearden* held that, before ordering imprisonment for failure to pay a fine, a sentencing court must determine whether an indigent probationer willfully refused to pay and, if his inability to pay was through no fault of his own, must consider alternative measures of punishment.  461 U.S. at 672.  *Bearden* built on a line of cases (often called the *Griffin* line after the first case in it) addressing discrimination against indigents in criminal proceedings, generally through an equal protection lens.  *See infra* Part V.F.1.a.i. (discussing the contexts to which *Griffin*'s and *Bearden*'s principles have been extended).  *Bearden* elaborated on this doctrine by holding that "[d]ue process and equal protection principles converge in the Court's analysis in these cases."  *Id*. at 665.  Instead of slotting *Bearden* claims into an existing mode of analysis, the Court asserted that this type of "issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as 'the nature of the

individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . . .'" *Id.* at 666–67 (quoting *Williams v. Illinois*, 399 U.S. 235, 260 (1970) (Harlan, J., concurring)).

Because of the hybrid nature of this claim, courts have varied in their analytical approaches to *Bearden* claims. *Bearden* itself applied more of a due process approach. *Id.* at 666 n.8. The Eleventh and Fifth Circuits have vacillated between analyzing *Bearden* claims either under equal protection or procedural due process standards, and they have often assessed claims under both approaches.[9]

For example, one of the Eleventh Circuit's recent *Bearden* cases involved a challenge to a city's policy of detaining indigent arrestees for up to forty-eight hours before a judge would assess their indigency and decide whether to release them on a recognizance bond. *Walker v. City of Calhoun*, 901 F.3d 1245, 1252–53 (11th Cir. 2018). The Circuit held that the district court "was wrong to apply heightened scrutiny from traditional equal protection analysis" and held that the question at bar "should be evaluated along something akin to a traditional due process rubric." *Id.*

---

[9] Some courts view *Bearden* as a mix of equal protection and substantive due process. *See, e.g.*, *Johnson v. Jessup*, 381 F. Supp. 3d 619, 629 (M.D.N.C. 2019); *Mendoza v. Garrett*, 358 F. Supp. 3d 1145, 1163 (D. Or. 2018); *Robinson v. Purkey*, 326 F.R.D. 105, 153 (M.D. Tenn. 2018). But this approach does not merit further discussion because Plaintiff's claim was not so pled and because the Eleventh Circuit has blessed a hybrid equal protection and procedural due process approach.

at 1265.  Due process made "particular sense in [that] case because the relief Walker [sought] [wa]s essentially procedural: a prompt process by which to prove his indigency and to gain release."  *Id.*

Still, the opinion in *Walker* does not lose sight of the equal protection harms inherent in any *Bearden* claim.

> The *sine qua non* of a *Bearden* . . . claim, then, is that the State is treating the indigent and the non-indigent categorically differently. Only someone who can show that the indigent are being treated systematically worse "solely because of [their] lack of financial resources,"—and not for some legitimate State interest—will be able to make out such a claim.

*Id.* at 1260 (quoting *Bearden*, 461 U.S. at 661).  Additionally, the panel deciding *Walker* was free to focus on the due process question because the former Fifth Circuit had already accepted "the principle," grounded in equal protection, "that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible."  *Id*. at 1258 (quoting *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978)).  The panel in *Walker* was only faced with the procedural question of how long the city could delay before granting detainees their constitutionally required opportunity to prove their indigency.

Defendant interprets *Walker* as holding that all *Bearden* claims should be analyzed under a procedural due process framework.  *Walker* and the recent case of *Jones v. Governor of Florida* bely this assertion.  In *Walker*, the Eleventh Circuit discussed a Fifth Circuit case, *ODonnell v. Harris County*, which held that the

indigent plaintiffs, who previously had no meaningful opportunity to obtain pretrial release without payment, merited bail hearings after forty-eight hours under both a due process analysis and by applying heightened scrutiny. *Id.* at 1266 n.12 (citing *ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018) [hereinafter *ODonnell I*]); *see also generally ODonnell I*, 892 F.3d 147. The Eleventh Circuit believed that heightened scrutiny was inappropriate in *Walker* because the defendant already offered a path to release without payment after forty-eight hours, but it acknowledged that Mr. Walker would have had a stronger case for heightened scrutiny had the facts been the same as in *ODonnell I*. 901 F.3d at 1266 n.12; *see also ODonnell v. Goodhart*, 900 F.3d 220, 227 (5th Cir. 2018) [hereinafter *ODonnell II*] (considering a later, more stringent preliminary injunction in the same case and deciding that heightened scrutiny did not apply for the same reason as in *Walker*: once the requirement of a hearing is in place, a claim that release is owed before forty-eight hours is subject to rational basis review).

Any remaining ground that Defendant's procedural-due-process-only interpretation could stand on was eliminated by the Eleventh Circuit's recent opinion in *Jones v. Governor of Florida*, 950 F.3d 795 (11th Cir. 2020) (per curiam). In that case, the plaintiffs challenged a Florida law that interpreted Florida's new felon-enfranchisement constitutional amendment to require payment of all fines, fees, and restitution before a felon was entitled to re-enfranchisement. *Jones*, 950 F.3d at 802–

03. The plaintiffs brought separate equal protection and due process claims, and the district court only decided the equal protection claim, so the Eleventh Circuit likewise analyzed the *Bearden* claim solely through an equal protection lens. *Id.* at 806–07 & n.8. The panel applied heightened scrutiny and affirmed the district court's preliminary injunction barring the defendants from 1) "preventing [the plaintiffs] from registering to vote based solely on an inability to pay outstanding legal financial obligations, where each plaintiff asserts that he or she is genuinely unable to pay" and from 2) "preventing the plaintiffs from actually voting if indeed they could establish that they are unable to pay." *Id.* at 805, 832–33. As explained in the previous section, Plaintiff must prevail on her equal protection argument to have a hope of success on her three *Bearden*-related due process arguments.

## C. <u>Mootness</u>

The question of mootness must be addressed first because "mootness is jurisdictional." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001).

> There is thus no case or controversy, and a suit becomes moot, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." But a case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." As "long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."

*Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (first quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013); and then quoting *Knox v. Serv. Emps.*, 567 U.S. 298, 307–308 (2012)). Mootness, like other justiciability doctrines such as standing and

ripeness, plays an important role in ensuring "that the parties involved have something real at stake, motivating them to make arguments on both sides." Susan C. Morse & Leigh Osofsky, *Regulating by Example*, 35 YALE J. ON REG. 127, 163 & n.173 (2018).

Defendant claims that this controversy is moot because Alabama's traffic tickets have been revised to warn recipients of the possibility of automatic license suspension for nonpayment of traffic fines and because the tickets now "provide[] constitutionally sufficient notice of the recipient's ability to have his or her ability to pay any associated fine taken into account." (*See* Doc. # 16, at 30–32 ("[T]he language on Alabama's traffic tickets now includes notice that the recipient's driver license may be automatically suspended if he or she fails to either pay the associated fine or appear in court in order to have his or her financial condition individually evaluated . . . .").) Before this suit was filed, the Alabama Supreme Court adopted a recommendation from its Standing Committee on the Rules of Judicial Administration that the Alabama Uniform Traffic Ticket and Complaint be revised. (Doc. # 7-20, at 3–4.) As of November 30, 2018, the new tickets include the following instructions,

> Upon a plea of guilty or a conviction for the offense charged within this complaint, you have 60 days to satisfy any monetary judgment against you. If you cannot pay any monetary judgment against you in 60 days, you may apply to the court to request payment of a monetary judgment in installments. You must obtain a court order approving an installment plan and provide proof of financial responsibility and such an order to

> the Secretary of the Alabama Law Enforcement Agency within 60 days of the entry of any monetary judgment against you OR YOUR LICENSE WILL BE SUBJECT TO AUTOMATIC SUSPENSION.

Ala. R. Jud. Admin. 19, Attachment One; (Doc. # 7-20, at 38.) The Series N ticket that Ms. Motley received did not contain this, or any similar language. Specifically, it did not contain any warning that her license may be suspended for her failure to pay, and it did not advise her as to what steps she could take if she was unable to pay the judgment. (Doc. # 7-20, at 3, 14; Doc. # 14-1, at 7; Doc. # 1, ¶ 34, at 9.) Defendant argues that "the State is already providing Plaintiff with the relief she purports to seek, so that this Court can afford her no relief beyond what is already being provided." (Doc. # 16, at 31.)

"If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." *Al Najjar*, 273 F.3d at 1336. While there is some overlap between the ticket revision and Plaintiff's non-*Bearden*-due-process injury, there remains a clear mismatch between the relief that the State is providing and the relief that Plaintiff is seeking, which precludes a finding of mootness. Plaintiff is not seeking to enjoin a return to the previous ticket form, and her license remains suspended after receiving the earlier ticket version. Therefore, the court's ability to grant Ms. Motley meaningful relief is not eliminated by the ticket revision.

First, the ticket revision does not provide the relief that Plaintiff is seeking to ameliorate her *Bearden* claims. As discussed in Plaintiff's mootness arguments, Plaintiff seeks to enjoin enforcement of Rule 26.11(i)(3) because its current form authorizes suspensions without requiring the constitutionally mandated safeguards to which licensees are allegedly entitled. Plaintiff's *Bearden* claim is founded on the belief that licensees must receive separate notice after they have defaulted on payment but before their licenses are suspended. Said notice must offer an ability-to-pay hearing, inform drivers that their ability to pay will be a "critical issue" in the hearing, and inform drivers that their licenses may not be suspended if they are unable to pay. (Doc. # 21, at 25–26.) The new ticket language does not provide any of those remedies nor does it reinstate Plaintiff's license, foreclose Plaintiff's requested declaratory relief, or "[p]revent[] ALEA from effectuating driver's license suspensions for nonpayment under Alabama Rule of Criminal Procedure 26.11(i)(3)." (Doc. # 1, at 15.)[10] The question of whether the court should grant

---

[10] Defendant argues that even if Plaintiff's claims were meritorious, she would only be entitled to procedural relief and not a blanket injunction barring enforcement of the Rule. (Doc. # 16, at 31–32 n.6.) This argument may be correct. *See ODonnell I*, 892 F.3d at 163 ("The fundamental source of constitutional deficiency in the due process and equal protection analyses is the same: the County's mechanical application of the secured bail schedule without regard for the individual arrestee's personal circumstances. Thus, the equitable remedy necessary to cure the constitutional infirmities arising under both clauses is the same: the County must implement the constitutionally-necessary procedures . . . ."). However, the ticket revision does not implement what Plaintiff views as the constitutionally necessary procedures under *Bearden*, and if she were to prevail, an injunction more narrowly tailored to rectify her injuries could be crafted. (*See* Doc. # 1, at 15 (requesting "other relief as the Court deems just and appropriate")); *see also Rondeau v.*

equitable or declaratory relief to rectify Rule 26.11(i)(3)'s alleged shortcomings and alter Defendant's enforcement actions is a question for the merits, not for mootness. *See Chafin*, 568 U.S. at 174 ("Ms. Chafin argues that this case is moot because the District Court lacks the authority to issue a re-return order either under the Convention or pursuant to its inherent equitable powers. But that argument—which goes to the meaning of the Convention and the legal availability of a certain kind of relief—confuses mootness with the merits.").

Second, Plaintiff's non-*Bearden* due process claim does not seek the form of relief offered by this policy change. Therefore, this case does not raise the often-thorny issue of what to do when a Plaintiff seeks to enjoin or to declare unconstitutional a policy that a governmental actor has subsequently repealed. *See, e.g.*, *Walker*, 901 F.3d at 1269–71. Because Plaintiff did not receive the new traffic ticket and because her license is still suspended, she has asked for and could merit license reinstatement to remedy the State's alleged failure to provide adequate notice. As Plaintiff persuasively argues, "[e]ven if the change were sufficient to

---

*Mosinee Paper Corp.*, 422 U.S. 49, 61 (1975) (holding that injunctive relief should be molded to the necessities of the particular case); *ODonnell I*, 892 F.3d at 163–67 (vacating the district court's preliminary injunction as overbroad and remanding with recommendations for crafting a preliminary injunction that would require the defendant to provide adequate procedures); *Parker v. Judicial Inquiry Comm'n of Alabama*, 295 F. Supp. 3d 1292, 1309 (M.D. Ala. 2018) ("[B]ecause an injunction is a form of equitable relief, 'a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.'" (quoting *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam) (internal quotation marks omitted)).

satisfy due process"—which she argues it does not—"it leaves unaltered" Plaintiff's claim because she received her ticket before November 30, 2018. (*See* Doc. # 21, at 27.) If Plaintiff's *Bearden* or due process claims were meritorious, some or all of Plaintiff's requested declaratory or injunctive relief could be effectually granted, so Plaintiff's claims are not moot.

## D.    <u>Statute of Limitations</u>

Because Plaintiff filed a claim under 42 U.S.C. § 1983 in Alabama, she is subject to a two-year statute of limitations. Ala. Code § 6-2-38(l); *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008). When that clock starts running is a question of federal law. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). In general, "the statute of limitations begins to run from the date 'the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003) (quoting *Rozar v. Mullis*, 85 F.3d 556, 561–62 (11th Cir. 1996)).

"[N]ot all injuries are equal. Sometimes, there is one discrete point at which the injury occurs. Other times, however, the injury happens over and over again. When the injury occurs determines when the statute of limitations starts running." *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1338 (M.D. Ala. 2019). Plaintiff asserts that this continuing violations doctrine applies to extend the time limit for her claims.

Consequently, it must be determined whether Plaintiff is suffering from "the present consequence of a one time violation, which does not extend the limitations period, [or] the continuation of that violation into the present, which does." *City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002) (quoting *Carter v. West Publ'g Co.*, 225 F.3d 1258, 1263 (11th Cir. 2000)).

"A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate if it is apparent from the face of the complaint that the claim is time-barred." *Gonsalvez v. Celebrity Cruises, Inc.*, 750 F.3d 1195, 1197 (11th Cir. 2013) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)). While the date that Plaintiff's license was suspended is not apparent from the face of her complaint, the court takes judicial notice of the fact that Plaintiff's license was suspended on December 20, 2013. (Doc. # 14-1, at 55.) This fact is derived from the Case Action Summary of Plaintiff's Montgomery County District Court proceedings, which is attached to Defendant's motion to dismiss. It may be judicially noticed because it is "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This fact can be accurately and readily determined from a public record of state court litigation, a source whose accuracy cannot reasonably be questioned. *See Osheroff*, 776 F.3d at 811–12 & n.4

("Courts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage.").

The fact of this judicial act is not in dispute. Plaintiff and Defendant have each cited this document in their factual summaries as evidence that Plaintiff's license was suspended.[11] (Doc. # 16, at 8; Doc. # 21, at 8); *United States v. Jones*,

---

[11] In a footnote of her response brief, Plaintiff disputes Defendant's interpretation of another entry in that same document. (Doc. # 21, at 8 n.3; *see also* Doc. # 21, at 7–8 n.2.) Defendant interprets an entry stating, "SET FOR: PAY DUE DKT/HEARIN [sic] ON 11/19/2013 @ 0800A," to mean that Plaintiff had an opportunity to appear in court at that time. (Doc. # 16, at 7–8.) Plaintiff's objection is well-taken, and judicial notice is not taken of this fact because it is subject to reasonable dispute and cannot be accurately determined from the source. (Plaintiff's similar objection at footnote 2 of her brief is not styled as a judicial notice objection, (Doc. # 21, at 7–8, n.2 (citing Doc. # 16, at 17)), but her concern is noted, and consideration of the facts in dispute is not necessary to decide this motion.)

Plaintiff concludes footnote 3, which specifically objects to the aforementioned fact, by making an ambiguous request: "Were this Court, however, inclined to take judicial notice, Plaintiff requests an opportunity 'to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed.' Fed. R. Civ. P. 201(e)." (Doc. # 21, at 8 n.3.) The court has not ignored Plaintiff's request for a hearing. For the reasons stated in the main text, the court does not interpret Plaintiff's general request to encompass a fact that she has shown to not be in dispute. In other words, Plaintiff's actions have waived a hearing on the propriety of taking notice of the date of suspension. (*See, e.g.*, Doc. # 21, at 14 (relying on the 2013 court filings for what they do not show: "Defendant's assertion is factually incorrect because there is no documentation in Motley's court records that the judge made an express ability-to-pay finding . . . .").)

Alternatively, the court may consider this extrinsic document (Doc. # 14-1, at 55) because it is "(1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).

To the extent that Defendant's statements regarding how the court "*may* take into account" or "*may* take judicial notice" of "court records relating to the traffic case resulting in the suspension of Plaintiff's driver license," (Doc. # 16, at 6–7 & n.1 (emphasis added)), constitute a broad request under Rule 201(c)(2) to take judicial notice of all of the facts contained within these records, that request is denied. Such notice is unnecessary to decide this motion. *See* Fed. R. Evid. 201(c)(2) ("The court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information."). To the extent that Defendant's statement that "the [c]ourt may also confirm the applicability of the statute of limitations to Plaintiff's claims by taking judicial notice" constitutes a 201(c)(2) request, (Doc. # 16, at 14–15), that request is granted for the reasons stated

29 F.3d 1549, 1553 (11th Cir. 1994) ("[A] court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation."). Plaintiff cites Defendant's exhibit at the page in question for the fact that "the court simply issued a warrant for Motley's arrest and suspended her driver's license for nonpayment. Doc. 14-1 at 55." (Doc. # 21, at 8.) Because there is only one entry on that page relating to imposing a suspension, Plaintiff can only be referring to the Alacourt entry stating "12/20/13 . . . SUSPENSION NOTICE FOR FTP ISSUED." In her response brief, Plaintiff's statute of limitations argument does not discuss when the claim first accrued or argue that it first accrued during the two years preceding her filing. Plaintiff's argument that the continuing violations doctrine should apply is an acknowledgement that she learned or should have learned of her suspension before July 3, 2017.

---

in the main text. Ultimately, the court does not take judicial notice of any other facts contained in Document # 14-1 for the purposes of Defendant's 12(b)(6) motion because such facts are unnecessary to decide this case.

Additionally, Plaintiff's complaint cites several of the exhibits accompanying her motion for a preliminary injunction, including Docs. # 7-1, 7-2, 7-3, 7-4, 7-6, 7-7, 7-8, 7-9, 7-10, 7-11, 7-12, 7-13, 7-14, 7-15, and 7-16. It is not necessary to take judicial notice of facts within these documents nor to make a finding regarding whether these documents are properly incorporated by reference into Plaintiff's complaint because viewing the complaint's allegations of fact as true accomplishes the same purpose. It is worth noting that both Plaintiff and Defendant are guilty of referencing facts and documents outside the complaint without explaining why the court can consider these facts or documents without converting this 12(b)(6) motion into a motion for summary judgment.

As noted by a district court considering a similar suspension claim, "determining whether a particular § 1983 claim presents a continuing violation depends, in significant part, on the court's determining 'what constitutes the defendant's 'wrongful conduct' . . . ."  *Robinson v. Purkey*, 326 F.R.D. 105, 146 (M.D. Tenn. 2018) (quoting *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *11 (M.D. Tenn. Nov. 9, 2017)).  "Defining the wrongful conduct, in turn, 'is closely related to the nature of the constitutional protection at issue.' . . . [T]he same general pattern of events may present either a continuing or a non-continuing violation, depending on the constitutional lens through which those events are viewed."  *Id.* (quoting *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *12 (M.D. Tenn. Nov. 9, 2017)); *see also Perez v. Laredo Junior Coll.*, 706 F.2d 731, 734–35 (5th Cir. 1983) (holding that a due process claim for the denial of a pay raise after attaining a doctoral degree outside the plaintiff's teaching area was a single act, but holding that an equal protection claim for not receiving that pay raise *while the plaintiff's employer granted raises to other employees for attaining such doctorates* could be a continuing violation); *Long v. State of Fla.*, 805 F.2d 1542, 1546 (11th Cir. 1986) (citing *Perez*'s continuing violation discussion with approval), *rev'd on other grounds*, 487 U.S. 223 (1988), *and abrogated on other grounds by Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820 (1990); *Doe 1*, 367 F. Supp. 3d at 1339 (distinguishing the plaintiffs' First Amendment compelled

speech and overbreadth claims, which inflicted new injuries each day, from other cases where the plaintiffs complained of being wrongfully registered as sex offenders, which accrued when they learned that they had been registered).

Plaintiff's *Bearden* theory (and its accompanying four injuries) is entitled to evaluation under a different constitutional lens from Plaintiff's non-*Bearden* procedural due process theory. This case poses a particularly tricky statute of limitations issue due to the odd nature of a *Bearden* claim, as detailed in Part V.B. On the question of whether the continuing violations doctrine applies, the Supreme Court's command that this "issue cannot be resolved by resort to easy slogans or pigeonhole analysis" hitches this court to two doctrines pulling in opposite directions. *Bearden*, 461 U.S. at 666.

As illustrated in the parties' briefs, discrimination claims often qualify as continuing violations because each instance of differential treatment is a new injury. *See, e.g.*, *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 449 (11th Cir. 1993) ("When the claim is one for discriminatory wages, the violation exists every single day the employee works."); *Mitchell v. Jefferson Cty. Bd. of Educ.*, 936 F.2d 539, 548 (11th Cir. 1991) ("[S]ex based, discriminatory wage payments constitute a continuing violation of the Equal Pay Act." (quoting *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1050 (5th Cir. 1973))); *Perez*, 706 F.2d at 734–35 (holding that an equal protection claim for not receiving a pay raise after attaining a doctoral degree

outside the plaintiff's teaching area while the plaintiff's employer granted raises to other employees for attaining such doctorates could be a continuing violation); *Long*, 805 F.2d at 1546 (citing *Perez*'s continuing violation discussion with approval); *Robinson*, 326 F.R.D. at 146 (holding that the plaintiffs could bring otherwise untimely equal protection claims because "the plaintiffs' injuries include the fact that the state's scheme currently treats them differently from otherwise identical non-indigent drivers, by allowing those drivers to have their suspensions lifted by making payments that the plaintiffs cannot make").

On the other hand, violations of due process for a property deprivation generally begin to run when the property is taken. *See, e.g.*, *Hillcrest Prop., LLC v. Pasco Cty.*, 754 F.3d 1279, 1283 (11th Cir. 2014) (holding that a substantive due process claim facially challenging an ordinance that decreased the plaintiff's property value accrued when the ordinance passed and immediately reduced the property's value); *Lufkin v. McCallum*, 956 F.2d 1104, 1106, 1108 (11th Cir. 1992) (affirming the district court's finding of untimeliness in a due process claim when the adverse employment action at issue was more than three years before the filing date); *Doyle v. Univ. of Ala. in Birmingham*, 680 F.2d 1323, 1326 (11th Cir. 1982) (holding that the plaintiff's procedural due process claim for the deprivation of a property interest "accrued on the date that she was placed on leave or probation without a noticed hearing"), *superseded by statute on other grounds*, Civil Rights

Restoration Act of 1987, Pub. L. No. 100–259, 102 Stat. 28 (1988), *as recognized in McMullen v. Wakulla Cty. Bd. of Cty. Commissioners*, 650 F. App'x 703, 704–05 (11th Cir. 2016); *Montanez v. Sec'y Pa. Dep't of Corrs.*, 773 F.3d 472, 480 (3d Cir. 2014) (holding that an inmate's due process claim accrued when he knew or should have known that the Department of Corrections had "deprived [him] of his property interests, allegedly without due process"); *Perez*, 706 F.2d at 734 (holding that a due process claim for the denial of a pay raise after attaining a doctoral degree outside of the plaintiff's teaching area was a single act); *Johnson v. Jessup*, 381 F. Supp. 3d 619, 636 (M.D.N.C. 2019) (assessing the timeliness of due process claims in a similar case and finding that "the DMV's revocation of driver's licenses is a 'single act' — the fact that licenses remain revoked thereafter does not evince 'a series of separate acts' in which the DMV revokes the driver's licenses anew each day" (quoting *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1167 (4th Cir. 1991))); *Robinson*, 326 F.R.D. at 145, 148 (dismissing procedural due process claims based on suspensions that occurred more than one year before filing). Naturally, Defendant argues that Plaintiff's injury is the "alleged deprivation of this state-created property interest" resulting from "a discrete action by the Montgomery County District Court on December 20, 2013, when it ordered her license suspended for failing to pay her traffic fines and court costs." (Doc. # 22, at 4–5.)

The court agrees that the continuing violations doctrine does not apply to a non-*Bearden* due process claim. Viewed through that constitutional lens, Defendant's wrongful conduct is the initial deprivation of Plaintiff's property interest, allegedly without adequate notice. Therefore, Plaintiff's claim that "[n]either the court nor ALEA gave her notice that her driver's license could be suspended for nonpayment" (Doc. # 1, ¶ 34, at 9) is time-barred.[12] *See supra* Part V.A. (explaining why this injury is analyzed separately from Plaintiff's *Bearden* injuries).

But Plaintiff's *Bearden* injuries do not constitute a pure procedural due process claim. Plaintiff invokes the equal protection aspect of her *Bearden* claim and argues that Defendant's wrongful conduct is ongoing unequal treatment: "Rule 26.11 authorizes an indefinite suspension based solely on nonpayment while allowing non-indigent drivers to avoid suspension altogether—or to obtain immediate reinstatement—by paying their fines and court costs in full." (Doc. # 21, at 19.)

---

[12] If, contrary to the court's conclusion in Part V.A., Plaintiff were required to bring this due process claim as a separate count, Plaintiff would not merit leave to amend her complaint because this count would be time-barred. "[A] motion for leave to amend may appropriately be denied . . . where amendment would be futile." *In re Engle Cases*, 767 F.3d 1082, 1108–09 (11th Cir. 2014) (quoting *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001)); *see also Coventry First, LLC v. McCarty*, 605 F.3d 865, 870 (11th Cir. 2010) ("A proposed amendment may be denied for futility 'when the complaint as amended would still be properly dismissed.'" (quoting *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007)).

If this were any other § 1983 claim arguing procedural due process and equal protection theories, the due process claims could be dismissed while the equal protection claims remained. That avenue is not available here given the interdependent nature of Plaintiff's *Bearden* claim. *See supra* Part V.A. Therefore, the timeliness of this case hinges upon whether the statute of limitations turns on the dominant features of the injury (a procedural injury) or that any part of the injury is a continuing violation. For the reasons below, this claim is not time-barred because Plaintiff's equal protection injury—that she is harmed by an allegedly discriminatory program—is essential to her *Bearden* claim.

Based on the dominant injuries suffered and remedy sought, Plaintiff's *Bearden* claim looks at first glance like a procedural due process claim, akin to *Walker*. The complaint nods to equal protection by alleging that the State is "punishing people simply because they are poor" and by stressing the impact of suspensions on Alabama's poor. (Doc. # 1, ¶¶ 1, 10–17, at 1, 3–5.) However, the bulk of the complaint alleges quintessential due process injuries, claiming that Rule 26.11(i)(3) unconstitutionally authorizes and Defendant unconstitutionally administers license suspensions without prior notice, without the opportunity to be heard, and without an express finding that the motorist can pay but willfully failed to do so. (Doc. # 1, ¶¶ 19–22, 29, 30, 34, 39, 43–44, 50, 55–56, 60.) Plaintiff's *Bearden* claim is so lopsided in this regard that, in the statute of limitations section

of her brief, her only direct references to her complaint are to her remedy, "prospective injunctive relief against Defendant to enjoin the *continued* suspension of her driver's license," (Doc. # 21, at 19–20 (emphasis in original)), and to one line of her complaint indicating that her driver's license "remains suspended because she is unable to pay her traffic ticket in full," (Doc. # 21, at 19 (citing Doc. # 1, ¶ 33, at 9)).

Still, Plaintiff's argument that her procedural injuries result from an ongoing discriminatory program cannot be ignored. Plaintiff points to another driver's license suspension case, *Robinson v. Purkey*, to support her theory. In that case, the district court dismissed separately brought procedural due process claims but held that the plaintiffs could bring otherwise untimely equal protection claims because "the plaintiffs' injuries include the fact that the state's scheme currently treats them differently from otherwise identical non-indigent drivers, by allowing those drivers to have their suspensions lifted by making payments that the plaintiffs cannot make." 326 F.R.D. at 145–48. She argues that her *Bearden* claim is likewise timely because a similar discrimination allegation is woven into the hybrid claim.

Defendant argues that *Robinson* is unpersuasive because it analogized the plaintiffs' claimed harm to the harms suffered in a Sixth Circuit substantive due process case despite there being no fundamental right to possess a driver's license. (Doc. # 22, at 3–4.) Defendant earns points for paying attention to case details: An

equal protection claim need not involve an injury to a fundamental right. However, both claims can involve allegations of systematic and ongoing deprivations, so substantive due process cases can be apt analogies when determining the applicability of the continuing violations doctrine. Defendant also alleges that *Robinson*, and by extension Plaintiff's argument, is unpersuasive because it fails to follow *Walker*'s procedural due process analysis of a *Bearden* claim. However, *Walker* provides a logical rationale for reconciling this issue.

Even though the Eleventh Circuit in *Walker* recommended using a procedural due process analysis to evaluate Mr. Walker's entitlement to what was essentially procedural relief, the panel emphasized that equal protection principles and values still underlie any *Bearden* claim. *Walker*, 901 F.3d at 1260. *Walker*, *ODonnell I & II*, and this case involve allegations that additional process may be needed to address "an allegation of categorically worse treatment of the indigent." *Id*.; *ODonnell I*, 892 F.3d at 163; *ODonnell II*, 900 F.3d at 224; *see also Walker*, 901 F.3d at 1265 ("The district court should have applied [a due process] analysis in evaluating whether the Standing Bail Order comported with the Constitution's equal protection and due process *guarantees*." (emphasis added)); *Briggs v. Montgomery*, No. CV-18-02684-PHX-EJM, 2019 WL 2515950, at *22 (D. Ariz. June 18, 2019) (applying the continuing violations doctrine to the plaintiffs' *Bearden* hybrid claims because the plaintiffs alleged that a pretrial diversion program systematically discriminated

on the basis of wealth).  In this light, Plaintiff Motley seeks *procedural relief* to remedy the suspension of her driver's license that allegedly *results from an ongoing policy* that discriminates against the poor.  Because Plaintiff's discrimination allegation is essential and non-severable from the rest of her *Bearden* claim, that claim (and the four injuries related to it) are timely.

## E.    <u>Laches</u>

Defendant also argues that Plaintiff's claims are barred by the equitable doctrine of laches.  To succeed on this defense, Defendant must show 1) "a delay in asserting a right or claim," 2) "that the delay was not excusable," and 3) "that there was undue prejudice to the party against whom the claim is asserted." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1283 (11th Cir. 2015) (quoting *Ecology Ctr. of La., Inc. v. Coleman*, 515 F.2d 860, 867 (5th Cir. 1975)).  The effect of Plaintiff's delay and whether allowing the suit would be inequitable to Defendant are generally the focal points of a laches inquiry.

> [L]aches does not result from a mere lapse of time but from the fact that, during the lapse of time, changed circumstances inequitably work to the disadvantage or prejudice of another if the claim is now to be enforced.  By his negligent delay, the plaintiff may have misled the defendant or others into acting on the assumption that the plaintiff has abandoned his claim, or that he acquiesces in the situation, or changed circumstances may make it more difficult to defend against the claim.

11A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2946 (3d ed. 2019) (quoting WILLIAM Q. DE FUNIAK, HANDBOOK OF MODERN EQUITY § 24, at

41 (2d ed. 1956)); *see also Envtl. Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980)[13] ("One basic principle has, however, been consistently followed: equitable remedies are not available if granting the remedy would be inequitable to the defendant because of the plaintiff's long delay.").

"Whether laches bars an action in a given case depends upon the circumstances of that case and is 'a question primarily addressed to the discretion of the trial court.'" *Alexander*, 614 F.2d at 478 (quoting *Gardner v. Panama R. Co.*, 342 U.S. 29, 30 (1951)). "Given the fact sensitive nature of a laches inquiry, courts have been hesitant to bar claims under a laches defense when there is limited factual information available," such as at the pleading stage. *Groucho's Franchise Sys., LLC v. Grouchy's Deli, Inc.*, No. 1:14-CV-1725-LMM, 2015 WL 11256661, at *2 (N.D. Ga. July 1, 2015) (collecting cases). However, "laches may be asserted by motion to dismiss for failure to state a claim—provided that the complaint shows affirmatively that the claim is barred." *Herron v. Herron*, 255 F.2d 589, 593 (5th Cir. 1958).

Plaintiff claims that laches categorically cannot bar claims for prospective injunctive relief. (Doc. # 21, at 20.) This is an unsettled legal question. *See Envtl. Def. Fund. v. Marsh*, 651 F.2d 983, 1005 n.32 (5th Cir. 1981) ("[L]aches may not

---

[13] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

be used as a shield for future, independent violations of the law. The concept of undue prejudice, an essential element in the defense of laches, is normally inapplicable when the relief is prospective."); *Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1264–65 (N.D. Fla. 2019) ("It is not clear whether laches applies at all to claims for prospective relief from continuing constitutional violations." (first citing *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990); then citing *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters. Int'l*, 533 F.3d 1287, 1321 (11th Cir. 2008); and then citing *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019))).  Plaintiff supports her argument with citation to one Eleventh Circuit case, which stated in the copyright infringement context that "laches serves as a bar only to the recovery of retrospective damages, not to prospective relief."  *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters. Int'l*, 533 F.3d 1287, 1321 (11th Cir. 2008); *see also id.* at 1321 n.41 (collecting cases in the copyright context where courts held that laches cannot bar injunctions against future intellectual property infringements).  It is not clear whether this principle applies to constitutional claims.  But it need not be determined whether Plaintiff's claimed *per se* bar exists because Defendant has not made a strong showing of prejudice and is therefore unlikely to merit the application of laches to Plaintiff's *Bearden* claim.

Plaintiff has unquestionably delayed in bringing her claims. Her proffered reason for the delay, that "[s]he is not trained in the law and had no reason to suspect that her driver's license suspension was unlawful," (Doc. # 21, at 21), has been rejected by the former Fifth Circuit. *Akers v. State Marine Lines, Inc.*, 344 F.2d 217, 220 (5th Cir. 1965) ("'[W]e know of no principle which enables persons to plead, not excusable ignorance of facts, but of the law which accorded them the right to sue.' Appellant's mistake as to the law or his unwillingness to press his claim when there was authority which indicated he might not prevail, cannot serve to excuse his delay . . . ." (quoting *Morales v. Moore-McCormack Lines, Inc.*, 208 F.2d 218, 221 (5th Cir. 1953))).

Read in context, the cases cited by Plaintiff stand for the proposition that a "plaintiff's lack of knowledge" of the *facts* underlying a possible claim "can serve as reason for delay." *Black Warrior Riverkeeper*, 781 F.3d at 1284–85 (holding that "[t]he district court . . . abused its discretion when it gave no weight to Riverkeeper's need to evaluate, investigate, and prepare its claims for litigation"); *Alexander*, 614 F.2d at 479 ("Their claim in effect is reduced to the assertion they did not realize it was illegal for the Army to do what it had done. However, the application of laches does not depend on subjective awareness of the legal basis on which a claim can be made. Moreover, . . . the record contains ample evidence that the problem should have been known . . . ."); *see also Save Our Wetlands, Inc. v. U.S. Army Corps of*

*Eng'rs*, 549 F.2d 1021, 1027–28 (5th Cir. 1977) (rejecting the plaintiffs' claim that "their delay in bringing this case is excusable because they were unaware of any illegality" surrounding the challenged development on the grounds that they had notice of the *fact* that the challenged development was underway). Because Plaintiff knew or should have known of the facts giving rise to her claim sometime between December 20, 2013, and July 2, 2017, lack of legal knowledge does not excuse her delay.

Evaluating claims of prejudice requires balancing the equities, weighing both the harm to Defendant, as well as the benefits that might result if Plaintiff is allowed to pursue her claim. *Black Warrior Riverkeeper*, 781 F.3d at 1286. Defendant argues it has been prejudiced in three ways: 1) Defendant has expended resources to defend against Plaintiff's suit, 2) the delay in filing suit impairs Defendant's ability to defend himself, and 3) the State changed its traffic tickets before this suit was filed to specifically inform drivers that their licenses will be suspended unless they request and receive a payment plan from the court. (Doc. # 16, at 16–18.)

Defendant's first argument that it is prejudiced by having to defend Plaintiff's claims at all is specious because it is a harm that Defendant would suffer regardless of when Plaintiff filed her lawsuit. As stated in *Black Warrior Riverkeeper*, "Any harm demonstrated by the [Defendant] must stem specifically from [Plaintiff's] delay in bringing suit, rather than from the consequences of an adverse decision on

the merits . . . ."  781 F.3d at 1286.  Defendant's first argument fails because the asserted harm does not stem from Plaintiff's *delay*.  Likewise, Defendant's third argument that it is prejudiced by the Alabama Supreme Court's choice to revise the State's traffic tickets is frivolous because that action is not causally connected to Plaintiff's delay, nor was it taken in reliance on Plaintiff's silence.  An argument that Defendant should not have to defend against moot claims is a mootness argument, not a laches argument.

Defendant's only cognizable argument is that it has been prejudiced by the loss of memory and evidence regarding what happened at Plaintiff's traffic court hearing.  Specifically, Defendant claims to be prejudiced by the uncertainty surrounding whether the Montgomery County District Judge asked Plaintiff about her ability to pay her traffic ticket when he imposed her fine.  Defendant points to Plaintiff's Declaration, attached to Plaintiff's motion for class certification, which states, "I do not remember the Judge asking me about my finances or whether I could pay the ticket."  (Doc. # 5-1, ¶ 3, at 1.)  It need not be decided whether Plaintiff's declaration or the other evidence cited by Defendant can be considered for purposes of this 12(b)(6) motion.  (*See* Doc. # 16, at 17 (claiming that "[t]he Montgomery County District Judge's order indicates on its face that he *did* make a determination that Plaintiff could pay by November 19, 2013, or at least that she should reappear in court on that date to explain why she could not" (emphasis in original))); *see also*

*supra* note 11 (addressing Plaintiff's objection to Defendant's characterization of the Montgomery County District Judge's order). Even if this evidence were considered, Defendant's argument is unavailing because of the nature of Plaintiff's *Bearden* claim. Plaintiff claims that Defendant's enforcement of Rule 26.11(i)(3) violated her Fourteenth Amendment rights and injured her through Defendant's failure to give her notice "that her ability to pay is a critical issue in determining the appropriateness of suspension" and to offer "an ability to pay hearing" *after* she defaulted but before her license was suspended. (Doc. # 1, ¶ 34, at 9; Doc. # 21, at 22.) She argues that Rule 26.11(i)(3) is facially unconstitutional because it authorizes suspensions without requiring the State to provide these protections. What happened at Plaintiff's fine-imposition hearing is largely irrelevant to Plaintiff's *Bearden* claim because she undisputedly did not receive the process she believes she is due.

Simply put, Defendant's prejudice arguments are dissimilar to cases where government actors have successfully asserted a laches defense. Defendant has not begun construction on some public works project. *Alexander*, 614 F.2d at 480. The State is not printing ballots for an election while battling allegations that additional candidates should be on it, *Perry v. Judd*, 471 F. App'x 219, 223, 227 (4th Cir. 2012), or facing the prospect of drawing new electoral districts twice in two years, *Chestnut v. Merrill*, 377 F. Supp. 3d 1308, 1317 (N.D. Ala. 2019); *see also Sanders v. Dooly*

*Cty.*, 245 F.3d 1289, 1290–91 (11th Cir. 2001) (per curiam) (affirming a district court's application of laches in part because "redistricting late in the decade would lead to back-to-back redistrictings"). "In [this] case, however, the Secretary has not alleged, let alone provided evidence of, some substantial administrative or logistical difficulties, confusion, disorganization, or expense which would be caused if the court allowed the [P]laintiff[] to press these admittedly delayed constitutional claims." *Mich. Chamber of Commerce v. Land*, 725 F. Supp. 2d 665, 682 (W.D. Mich. 2010) (involving an as-applied challenge to the Michigan Secretary of State's interpretation of the Michigan Campaign Finance Act). In fact, if Plaintiff's suit is meritorious, Plaintiff's delay has saved Defendant from expending State resources on additional notices and hearings over the last six years.

Despite Defendant's attempts to shift focus onto the notice and hearing given before imposition of a traffic fine (as Defendant does throughout its briefing), Plaintiff's *Bearden* claim centers on Alabamians' alleged rights to notice and a hearing in the time between default and suspension. There is no dispute that Plaintiff was not afforded such process and that Rule 26.11(i)(3) does not require it. Ultimately, Defendant has made a weak showing of prejudice, which is fatal to its claim for laches. Plaintiff's laches argument did not mention any benefits to weigh against Defendant's prejudice, but even if Plaintiff only stood to gain a negligible

improvement in her quality of life, such benefits would outweigh Defendant's claimed inequity.

Defendant must also show that its stated grounds for prejudice apply to Plaintiff's claim for declaratory relief, which is a heavier lift. *Sanders*, 245 F.3d at 1291 ("None of the grounds for prejudice that the district court relied on applies to the plaintiffs' claims for a declaration that the 1992 plan violates the Equal Protection Clause."); *Navarro v. Neal*, 716 F.3d 425, 429–30 (7th Cir. 2013) (allowing a claim for declaratory relief to proceed because the court failed to see "how the plaintiffs' delay in filing suit could impact a purely prospective remedy"). *But see City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005) (applying laches to bar an Indian tribe's claims for declaratory and injunctive relief recognizing its sovereignty over parts of central New York). The rationale employed to permit Plaintiff's *Bearden* claim for injunctive relief applies with equal, if not greater, force to Plaintiff's *Bearden* claim for declaratory relief, so that claim is not barred by laches.

Defendant has not made a specific argument that Plaintiff's non-*Bearden* procedural due process claim is barred by laches. Unlike Plaintiff's *Bearden* claim, Plaintiff's claim that she was not notified that her license could be suspended for nonpayment could depend on the facts of what she was told by, for example, the officer who wrote her traffic ticket or the judge who imposed her fine. The memories

of these, and other witnesses, may have faded. (There is no dispute that Rule 26.11(i)(3) does not require the State to give individual notice of this possibility.) However, Defendant has not argued this exact point, and prejudice to Defendant is not evident from Plaintiff's complaint or filings. While Defendant has made a general objection that "memories are fuzzy," (Doc. # 22, at 7), its only evidence of stale memories is Plaintiff's statement that she does not remember if the judge at her fine-imposition hearing asked about her ability to pay. Defendant's arguments do not call into question Plaintiff's allegation that "[n]either the court nor ALEA gave her notice that her driver's license could be suspended for nonpayment." (Doc. # 1, ¶ 34, at 9.) Although, if Plaintiff bears the burden of showing "either absence of prejudice or an excuse for delay" on this claim, she would likely fail to meet her burden. *See Coffey v. Braddy*, 834 F.3d 1184, 1192 (11th Cir. 2016) ("When a claim is filed within the analogous statutory period, the burden is on the defendant to show that it was prejudiced by the plaintiff's inexcusable delay; when the claim is filed outside of the statutory period, the plaintiff must show either absence of prejudice or an excuse for delay.") This issue need not be decided because it has not been fully briefed and because the statute of limitations bars this procedural due process claim.

**F.** **The Merits**

*1. Equal Protection*

Recent *Bearden* cases such as *Walker* and *ODonnell I* have taken for granted that a plaintiff could prevail by successfully arguing either an equal protection or a due process theory. The courts deciding these cases could choose to employ either rubric because previous cases had already established that a government must have some concern for the burdens placed upon indigent people in the contexts of pre-trial detention. However, this case is an exception because *Griffin/Bearden's* principle of "equal justice" for indigent people has not been extended to the context of driver's license suspensions.

Therefore, before it can be determined whether the State was constitutionally required to give Plaintiff notice "that her ability to pay is a critical issue in determining the appropriateness of suspension," to provide her "an ability to pay hearing prior to the suspension," and/or to make an express finding that she willfully failed to pay, (Doc. # 1, at 9), Plaintiff must first state a plausible claim that Rule 26.11(i)(3) is facially unconstitutional because it authorizes suspensions without requiring the State to consider her ability to pay. Plaintiff has not argued a substantive due process theory, nor would she likely succeed on such a claim in this Circuit. *See McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) ("[A]reas in which substantive rights are created only by state law (as is the case

with tort law and employment law) are not subject to substantive due process protection . . . ."); *Burlison v. Rogers*, 311 F. App'x 207, 208 (11th Cir. 2008) (per curiam) ("When the right at stake—here, possession of a driver's license—is a right created only by state law, it is not a right that gives rise to substantive due process protection under the Due Process Clause." (citing *McKinney*, 20 F.3d at 1555–56)). Therefore, the right to an indigency exception must arise under the Equal Protection Clause. This case is more analogous to *Jones* than *Walker* because it must be determined whether *Bearden*'s principles extend to this context. Accordingly, the court will follow the analytical steps laid out in *Jones*, with an added intermediate step from *Walker*, regarding whether and how to apply heightened scrutiny to a purported *Bearden* claim.

### a. Heightened Scrutiny

The *Jones* panel provided a two-step instruction manual on how to determine the applicability and effect of heightened scrutiny. First, determine if this type of case falls within one of the "discrete areas" where "the Supreme Court has told us that wealth classifications require more searching review." *Jones*, 950 F.3d at 817. Second, if this case is subject to more searching review, analyze whether *Bearden*'s four factors counsel in favor of a determination that the challenged Rule is unconstitutional. *Id.* at 825. *Walker* adds an additional necessary condition after

*Jones*'s first step: determine if the policy produces an absolute deprivation or a mere diminishment of Plaintiff's interest.

### i. *Jones* Step 1

"Where a law draws suspect classifications or burdens fundamental rights, we look beyond the benign glance of rational basis review and demand a tighter fit between the classification and the government's interests." *Jones*, 950 F.3d at 817. This case does not fit into either category because "wealth is not a suspect classification," *Jones*, 950 F.3d at 817, and a driver's license is not a fundamental right. *McKinney*, 20 F.3d at 1556; *Burlison*, 311 F. App'x at 208. Therefore, the Rule only merits heightened scrutiny if it falls into an "exception[] to that general rule," *M.L.B.*, 519 U.S. at 124, "that fee requirements ordinarily are examined only for rationality." *Id.* at 123; *see also Romer v. Evans*, 517 U.S. 620, 631 (1996) ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end."); *Jones*, 950 F.3d. at 817 (citing *M.L.B.*, 519 U.S. at 123).

So far, four categories of cases have fallen into this exception. *Bearden*'s exception applies to wealth discrimination that affects the administration of criminal justice, particularly by imprisoning or punishing[14] indigents for their inability to

---

[14] The *Jones* panel interpreted the *Bearden-Tate-Williams* line of cases to stand for the proposition that "[t]he Supreme Court has also determined that a state may not extend *punishment*

satisfy some financial burden. *See Bearden*, 461 U.S. 660; *Tate v. Short*, 401 U.S. 395, 399 (1971) ("Since Texas has legislated a 'fines only' policy for traffic offenses, that statutory ceiling cannot, consistently with the Equal Protection Clause, limit the punishment to payment of the fine if one is able to pay it, yet convert the fine into a prison term for an indigent defendant without the means to pay his fine."); *Williams v. Illinois*, 399 U.S. 235, 240–41 (1970) (holding that Illinois's practice of extending a prisoner's sentence beyond the maximum authorized by the statute of conviction because of a prisoner's "involuntary nonpayment of a fine or court costs" is "an impermissible discrimination that rests on ability to pay"); *Jones*, 950 F.3d at 820 (holding that heightened scrutiny is warranted where the state "demanded that punishment continue for some and not others based on wealth" and doubly so "where the punishment itself takes the form of denying access to the franchise"); *Walker*, 901 F.3d 1245.

*Griffin*'s exception applies to policies, such as filing and transcript fees, that restrict access to courts in criminal cases and in civil habeas actions. *See, e.g.*, *Mayer v. Chicago*, 404 U.S. 189 (1971) (applying *Griffin* to overturn Chicago's practice of only providing free transcripts for appeals in felony cases); *Smith v. Bennett*, 365 U.S. 708, 713 (1961) (holding that states must "docket applications for the post-

---

on account of inability to pay fines or fees." *Jones*, 950 F.3d at 818 (emphasis added). This holding is surprising considering that the most readily apparent commonality among the *Bearden* line of cases is *imprisonment*. Still, this new interpretation is binding.

conviction remedy of habeas corpus by indigent prisoners without [a] fee payment"); *Griffin*, 351 U.S. 12 (holding that the "guarantees of due process and equal protection" forbid states from conditioning a criminal defendant's right to appeal on the appellant's ability to afford a transcript).

*Griffin*'s exception has also been extended to provide access to courts in civil cases involving state controls or intrusions on fundamental family relationships. *See M.L.B.*, 519 U.S. at 116, 128 (holding that states cannot condition the right to appeal a decision permanently terminating parental rights on the terminated parent's ability to afford a transcript); *Little v. Streater*, 452 U.S. 1, 13–17 (1981) (holding that states must pay for blood grouping tests sought by an indigent defendant to enable him to contest a paternity suit); *Zablocki v. Redhail*, 434 U.S. 374 (1978) (striking down a statute that required an individual to show that he had satisfied court-ordered child support before being able to marry); *Boddie v. Connecticut*, 401 U.S. 371 (1971) (holding that states cannot deny divorce to indigent couples for failing to pay court costs).

The fourth exception has applied to restrictions on the right to participate in political processes as voters and candidates. *See, e.g.*, *Lubin v. Panish*, 415 U.S. 709, 710, 718 (1974) (invalidating a California statute requiring payment of a ballot-access fee fixed at a percentage of the salary for the office sought); *id.* at 719–20 (Douglas, J., concurring) (invoking *Griffin* in support of the Court's holding);

*Bullock v. Carter*, 405 U.S. 134, 135, 145, 149 (1972) (invalidating a Texas scheme under which candidates for local office had to pay fees as high as $8,900 to get on the ballot); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 664, 666 (1966) (invalidating, as a denial of equal protection, an annual $1.50 poll tax imposed by Virginia on all residents over the age of 21); *Jones*, 950 F.3d at 823 ("[O]nce a state provides an avenue to ending the punishment of disenfranchisement—as the voters of Florida plainly did—it must do so consonant with the principles of equal protection and it may not erect a wealth barrier absent a justification sufficient to overcome heightened scrutiny."); *see also id*. at 825 ("Quite simply, two strands of Supreme Court law—those embodied in its *Griffin–Bearden* line of cases outlawing different levels of punishment for similarly situated defendants, solely on account of wealth, and those found in the *Harper* line of cases underscoring the importance of access to the ballot—run together in this case. These weighty interests are directly implicated[,] and they yield the conclusion that we must examine the Amendment's impact on the seventeen named plaintiffs through the lens of heightened scrutiny.").

Despite Plaintiff's arguments to the contrary, these four categories are currently the only exceptions meriting heightened scrutiny, and neither the Supreme Court nor the Eleventh Circuit is engaged in a steady course of adding to this list. *See Jones*, 950 F.3d at 817–21. In the *Griffin* access-to-courts line of cases, the Court has rejected exceptions involving interests that are at least as important to

individuals as Plaintiff's interest in her license, including one's interest in filing for bankruptcy or in appealing welfare determinations. *See, e.g.*, *Ortwein v. Schwab*, 410 U.S. 656, 659 (1973) (per curiam) ("In *Kras*, we observed that one's interest in a bankruptcy discharge 'does not rise to the same constitutional level' as one's inability to dissolve his marriage except through the courts. 409 U.S. at 445. In this case, appellants seek increased welfare payments. This interest, like that of *Kras*, has far less constitutional significance than the interest of the *Boddie* appellants."); *United States v. Kras*, 409 U.S. 434, 445 (1973).

This case comes closest to falling in the *Bearden* line of cases. Plaintiff was charged in her 2013 ticket with driving with a suspended license,[15] a misdemeanor offense. Ala. Code § 32-6-19(a)(1); (*see* Doc. # 7-21, at 2.) The Eleventh Circuit has interpreted *Griffin* and *Bearden* to stand for the proposition that "heightened scrutiny is triggered when the State alleviates punishment for some, but mandates that it continue for others, based solely on account of wealth." *Jones*, 950 F.3d at

---

[15] The court takes judicial notice of the fact that Ms. Motley's ticket accused her of driving with a suspended license in violation of Ala. Code § 32-6-19. This fact is contained in the citation record for Plaintiff's June 18, 2013 ticket. It is not reasonably subject to dispute because both Plaintiff and Defendant acknowledge this fact in their briefing. (Doc. # 21, at 7 (citing Doc. # 7-21, at 2); Doc. # 16, at 7 (citing Doc. # 14-1, at 7, which is likewise a copy of the citation record).) It can accurately and readily be determined from an official public record of Plaintiff's ticket (a charging document in state court litigation), whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *Osheroff*, 776 F.3d at 811–12 & n.4. Alternatively, the court may consider this extrinsic document (Doc. # 7-21, at 2) because it is "(1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd.*, 600 F.3d at 1337; *see also Harris*, 182 F.3d at 802 n.2.

819.  However, Defendant correctly argues that "the suspension of Plaintiff's license is not the continuation of a punishment imposed at criminal sentencing" because Plaintiff's *punishment* was the imposition of a fine after being convicted of a traffic offense.  (Doc. # 29, at 2; Doc. # 1, ¶ 33, at 9.)  The State is not currently punishing Plaintiff for the traffic offense; it is depriving her "of a property interest—such as a driver's license—because of [her] inability to pay a fine associated with that interest."  *Fowler v. Johnson*, No. CV 17-11441, 2017 WL 6379676, at *7 (E.D. Mich. Dec. 14, 2017), *rev'd and remanded on other grounds sub nom. Fowler v. Benson*, 924 F.3d 247 (6th Cir. 2019).  Plaintiff is, therefore, in a different situation from the *Jones* plaintiffs, whose original criminal sentences included the punishment of disenfranchisement.  *See Jones*, 950 F.3d. at 819–20.

Plaintiff has taken two somewhat contradictory positions on the question of what type of sanction is at issue.  She chiefly argues that *Jones* and *Bearden* govern this case, implying that her license suspension is a criminal punishment, but she also suggests that suspension under Rule 26.11(i)(3) is a form of civil contempt and is governed by *Turner v. Rogers*, 564 U.S. 431 (2011).  (*Compare* Doc. # 28 (arguing that *Jones* is relevant authority), *and* Doc. # 21, at 9–17, *with* Doc. # 21, at 13; *see also* Doc. # 21, at 10 n.5 (arguing that because licensees must pay their fines in full to have their licenses reinstated, their suspensions "cannot be equated with the alternatives a court may impose 'in lieu of a fine' like the payment plans or

community service identified in *Bearden*").)  Plaintiff has attempted to explain away this contradiction by arguing that *Turner* expands *Bearden* to the civil contempt context, but a closer evaluation suggests that these are separate lines of precedent.[16]

*Turner* is, first and foremost, a right-to-counsel case.  Mr. Turner had been imprisoned through a civil contempt proceeding for failing to pay child support. *Turner*, 564 U.S. at 436.  The central question was "whether the Due Process Clause grants an indigent defendant, such as Turner, a right to state-appointed counsel at a civil contempt proceeding, which may lead to his incarceration."  *Id.* at 441.  The Court held that there was no automatic right to counsel so long as "the opposing parent or other custodian (to whom support funds are owed) is not represented by counsel and the State provides alternative procedural safeguards equivalent to" the following:

> (1) notice to the defendant that his 'ability to pay' is a critical issue in the contempt proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status (e.g., those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay.

*Id.* at 447–48.

---

[16]  This finding would stand even if the court considered Plaintiff's expanded discussion of this issue in her brief in support of her motion for a preliminary injunction.  (Doc. # 4, at 20–21, 22, 24–25, 30 n.21.)

In order to explain how civil contempt differs from criminal contempt (where the defendants have a Sixth Amendment right to counsel), the Court quoted *Hicks v. Feiock*, 485 U.S. 624, 638 n.9 (1988), for the principle that "[a] court may not impose punishment 'in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order.'" *Id.* at 442. Plaintiff argues that this principle applies to her case. Examination of the cases cited in *Hicks* in support of this principle reveals that this line of cases dates back to the tenure of Chief Justice Taft and, more importantly, that the *Hicks* principle is not grounded in equal protection doctrine. *See Hicks*, 485 U.S. at 638 n.9; *United States v. Rylander*, 460 U.S. 752, 757 (1983); *Shillitani v. United States*, 384 U.S. 364, 371 (1966); *Oriel v. Russell*, 278 U.S. 358, 366 (1929) (quoting *In re Epstein*, 206 F. 568, 570 (E.D. Pa. 1913)). Mr. Turner's ability to pay (one of many possible forms of inability to comply) was a critical issue in his civil contempt proceeding under state law and under this broader principle, not under the Equal Protection Clause. *See* 564 U.S. at 436, 442.

Despite *Turner*'s "ability-to-pay" language, it is not clear that *Turner* is an extension of *Bearden*; *Turner* appears to only define an alleged civil contemnor's due process rights. Plaintiff's underdeveloped civil contempt theory may, for a future plaintiff, be a more apt vehicle for attacking Rule 26.11(i)(3), as the Rule does

appear to create some form of civil penalty. But because this appears to be a due process theory, Plaintiff's attempt to argue it is untimely. *See supra* Part V.D.

Returning to the *Jones* equal protection analysis, *Jones* notes that *Griffin*'s equality principle (and, accordingly, heightened scrutiny) "has been applied to state action that burdens important constitutional interests, such as fundamental associational and political participation interests." *Jones*, 950 F.3d at 820. The continued possession of a driver's license is unquestionably an important interest for most Alabamians. Plaintiff's suspended license impairs her ability to secure and retain employment, apply for housing, cash checks, and access medical care. (Doc. # 1, ¶¶ 35–36, at 9.) But the continued possession of a driver's license is not an "important *constitutional* interest" on the same plane as imprisonment and criminal punishment, disenfranchisement, the inability to access criminal judicial processes, or the deprivation of family rights. Applying heightened scrutiny to Rule 26.11(i)(3) is not warranted.

> ### ii. *Walker*'s "Absolute Deprivation" Test (*Jones* Step 1.5)

Notably, the parties' heightened scrutiny arguments did not focus on context and instead focused on *Walker*'s discussion of a line of dicta in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973). *Walker*'s summary of *Rodriguez* suggests a different test for when heightened scrutiny applies to a wealth discrimination claim:

> Analyzing prior cases, with a focus on *Bearden*'s antecedents, the [Supreme] Court concluded that instances where wealth-based distinctions were impermissible "shared two distinguishing characteristics: because of their impecunity[, indigent persons] were completely unable to pay for some desired benefit, and as a consequence, they sustained *an absolute deprivation* of a meaningful opportunity to enjoy that benefit."

*Walker*, 901 F.3d at 1261 (quoting *Rodriguez*, 411 U.S. at 20).

*Rodriguez* involved a challenge to Texas's system of funding primary and secondary education in part through local property taxes, which resulted in wealth-based disparities in local education budgets. *Rodriguez*, 411 U.S. at 15–16. *Rodriguez*'s reference to an "absolute deprivation" introduced a discussion of cases, including *Griffin*, *Douglas v. California* (372 U.S. 353 (1963)), *Williams*, *Tate*, and *Bullock*, where indigent individuals were absolutely deprived of their rights to access court processes in criminal trials and appeals, to have appointed counsel on direct appeal in a criminal case, to not be imprisoned for failure to pay a fine, and to run for elected office. *Id*. at 21–22. The Court in *Rodriguez* held that there was no suspect classification at issue. *Id.* at 28. The Court was also skeptical of the idea that a fundamental constitutional right to an education existed, but avoided deciding that issue because the disparate budgets represented a diminishment, not an absolute deprivation, of the alleged "right" to an education. *Id.* at 36–37 ("Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the

present levels of educational expenditures in Texas provide an education that falls short. Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved . . . .").

*Walker* does not clearly explain that the *Rodriguez* "test" is a necessary but not a sufficient condition for heightened scrutiny in a wealth discrimination case. The *Jones* panel made no mention of this section of *Rodriguez* or of *Walker*'s emphasis on it, despite citing both cases. The logical explanation for this seeming disconnect is that there are two necessary conditions that must be satisfied before a wealth discrimination claim merits heightened scrutiny. Each case focused on the necessary condition that was in doubt while omitting discussion of the necessary condition that was obviously satisfied. *Walker* turned upon the distinction between absolute and relative deprivation because the constitutional interest at issue had previously been recognized in *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978). *Jones* turned upon whether the "desired benefit" was constitutionally important enough to merit an exception, because the plaintiffs had unquestionably suffered an absolute deprivation of their rights to vote.

*Walker*'s absolute deprivation test functions as a *Jones* Step 1.5. Defendant argues that Ms. Motley and other individuals with similar suspensions are not

absolutely deprived of their licenses because it is possible that they may obtain and complete payment plans. But this assertion runs afoul of the *Rodriguez* Court's statement that *Williams* involved an absolute deprivation. The appellant in that case was incarcerated to work off his monetary obligations at a rate of $5 per day. *Williams*, 399 U.S. at 236. Because of this system, Mr. Williams was more likely to eventually "pay" his debt and receive his "desired benefit" than Ms. Motley, whose future ability to pay cannot be certain. Because Plaintiff has no certain end date to her deprivation, this case cannot be analogous to *Walker*, where the indigent person was guaranteed an opportunity to argue for his or her "desired benefit" of relief on a recognizance bond within forty-eight hours after detention. If Mr. Williams was absolutely deprived, so is Ms. Motley, and *Walker*'s necessary condition is satisfied. But because her desired benefit is not an important constitutional interest, proceeding to *Jones*'s second step, analyzing the Rule along *Bearden*'s four factors, is inappropriate. Instead, the proper approach is to determine whether the Rule survives rational basis review.

### b. Rational Basis Review

Under rational basis review,[17] a law must be rationally related to a legitimate governmental interest, and it "must be upheld against equal protection challenge if

---

[17] In *Jones*, the Eleventh Circuit conducted two rational basis analyses: one analyzing the challenged rule as applied to the plaintiffs at bar who were genuinely unable to pay and one

there is any reasonably conceivable state of facts that could provide a rational basis for the classification" between persons. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). While not "toothless," rational basis review is highly deferential to governmental action. *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)). When reviewing a statute for rationality, a court must ask "whether there is *any* rational basis for the law, even if the government's proffered explanation is irrational, and even if it fails to offer any explanation at all." *Jones*, 950 F.3d at 809. "[T]he varying treatment of different groups or persons" must be "so unrelated to the achievement of any combination of legitimate purposes that [one] can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97 (1979).

"The question [to] ask is whether the legislature could have conceived of a rational basis for the classification it drew." *Jones*, 950 F.3d at 809. "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns, Inc.*,

---

analyzing the challenged rule as applied to the whole class of felons whom it affected. The court found that the law failed rational basis review with respect to the former group because disenfranchisement did not increase the likelihood of repayment. However, the court found that the law passed rational basis review with regard to the latter group because those plaintiffs had not shown that the class as a whole had similar financial constraints. *Jones*, 950 F.3d at 809–17. This portion of the court's opinion is not binding because the panel found that heightened scrutiny applied, and it invalidated the challenged law on that basis. *Id.* at 817–28. The *Jones* analysis is additionally distinguishable because Ms. Motley has disclaimed all right to bring an as-applied challenge and is only bringing a facial challenge to this Rule. (Doc. # 21, at 22–24.) Therefore, one broad rational basis analysis has been conducted in this case.

508 U.S. at 315.  Plaintiff must show that the facts do not support the classification and that "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Bradley*, 440 U.S. at 110–11.

As the party challenging the lawfulness of the legislative classification, Plaintiff bears the burden of making a plausible showing of irrationality.  Statutes that do not draw lines based on suspect classes or burden fundamental rights bear "a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'"  *Beach Commc'ns, Inc.*, 508 U.S. at 314–15 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)) (internal citation omitted).

Defendant has offered the following justification for the State's wealth-based classification:

> This rule is rationally related to the government's legitimate purpose in enforcing the collection of fines, restitution, and court costs incurred with traffic tickets issued for traffic infractions.  This, of course, is related to the State's larger purpose in protecting public safety th[r]ough enforcing the rules of the road.  The sanction of the suspension of a driver['s] license for failure to pay traffic tickets is a powerful incentive for a motorist to pay fines and costs incurred in a traffic offense.

(Doc. # 16, at 26.)

Defendant also argues that the harsh consequences of the Rule are mitigated somewhat when "read in conjunction with Rule 26.11(a) and (d)" which, in

Defendant's view,[18] "expressly require courts to consider a defendant's financial resources and to determine whether a defendant should be allowed to pay a monetary fine in installments and what length of time should be allowed for payment." (Doc. # 16, at 26); *see* Ala. R. Crim. P. 26.11(a) ("The financial resources and obligations of the defendant and the burden that payment of restitution will impose should be considered in determining how much restitution is to be paid or collected, i.e., whether to be paid by installments and what length of time should be given for payment."); Ala. R. Crim. P. 26.11(d) ("If the defendant cannot pay the costs, fine, and/or restitution immediately after pronouncement of the sentence as preferred, the court may permit payment of the costs, fine, and/or restitution, at some later date, or in specified installments."); *see also* Ala. R. Crim. P. 26.11(b), 26.11(b)(2)–(3) ("[I]n determining whether to impose a fine, the court should consider: . . . (2) The financial resources and obligations of the defendant and the burden that payment of a fine will impose; [and] (3) The ability of the defendant to pay a fine forthwith on an installment basis or on other conditions to be fixed by the court . . . ."). Defendant argues that "[t]hese rules of procedure adequately balance the State's interest in

---

[18] *See supra* note 4 and accompanying text (finding that "[t]he words *should* and *may*, when read in their ordinary sense, mean that courts are not required to consider the indigency of the defendant in deciding whether to impose a fine or in determining why a fine has not been paid").

enforcing traffic fines with fairness to indigent defendants and thus satisfy rational basis review." (Doc. # 16, at 26.)

Plaintiff responds that the Rule lacks a rational basis because "'there is no empirical evidence suggesting that people comply with requirements because their driving privilege was suspended'—let alone that such license suspension policies result in increased collections from *indigent persons*." (Doc. # 21, at 12 (emphasis in original) (quoting Doc. # 7-17, at 16).) She also argues that research supports the view that license suspensions for non-compliance with court requirements detract from public safety and lack rehabilitative or deterrent value. (Doc. # 21, at 12–13 (first citing Doc. # 7-17 at 9, 16, 19–20 and then citing Doc. # 7-18, at 9).)[19]

Rational basis review can include consideration of possible explanations not offered by the State. *Beach Commc'ns, Inc.*, 508 U.S. at 315; *Jones*, 950 F.3d at 809. In their appellate brief in *Mendoza v. Strickler*, the officials representing the Oregon State government offered a persuasive rationale for why this type of policy is rational even when applied to indigent persons. "Where a state's primary means

---

[19] It need not be decided whether the extrinsic documents Plaintiff cites can be considered at the 12(b)(6) stage, because even with their consideration, Plaintiff would not prevail on this issue. Plaintiff's pincites have been adjusted to reflect the CM/ECF page numbers.

This finding would stand even if the court considered Plaintiff's expanded discussion of this issue in her brief in support of her motion for a preliminary injunction. (Doc. # 4, at 29–31 (arguing that the Rule is irrational because suspending licenses for nonpayment hurts suspended persons' employment prospects and, thus, their abilities to repay their fines and arguing that people who are too poor to pay cannot be coerced into paying money that they do not have and cannot obtain).)

of ensuring compliance with traffic laws is financial penalties, a driver who has no means of paying those penalties—that is, someone who has no wages to garnish, no tax refunds to offset, and no ability to obtain credit regardless of outstanding traffic debts—suffers little practical consequence for violating traffic laws. For such drivers, one reasonable way to deter violations is a non-financial penalty such as license suspension." Brief for Appellees, *Mendoza v. Strickler*, No. 19-35506, 2019 WL 6351532, at \*35–36 (9th Cir. Nov. 20, 2019) (internal citation omitted).

As far as this court is aware, all but one federal court to consider this question has found that such policies pass rational basis review. Courts have generally reached this conclusion because, even assuming that these practices are not good policy, "[m]isguided laws may nonetheless be constitutional." *Fowler*, 924 F.3d at 263 (quoting *James v. Strange*, 407 U.S. 128, 133–34 (1972)), *aff'g on this ground, rev'g on other grounds sub nom. Fowler v. Johnson*, No. CV 17-11441, 2017 WL 6379676 (E.D. Mich. Dec. 14, 2017); *see also id.* at 262–63 ("By imposing greater consequences for violating traffic laws, the state increases deterrence for would-be violators. The state also has legitimate interests in promoting compliance with court orders and in collecting traffic debt. . . . Michigan's choice to wield the cudgel of driver's-license suspension for nonpayment of court debt dramatically heightens the incentive to pay. Such a policy is rationally related to 'the government's interest in prompt assessment and collection of civil penalties.'" (quoting *Blackhawk Mining*

*Co. v. Andrus*, 711 F.2d 753, 757 (6th Cir. 1983))); *Johnson*, 381 F. Supp. 3d at 631 ("Revocation of driver's licenses for failure to pay traffic violation fines or costs serves . . . to impos[e] a motivation to accomplish what an individual might otherwise be disinclined to do — here, to pay the fines and costs properly imposed on traffic defendants." (alteration in original) (citation and internal quotation marks omitted)); *Mendoza v. Garrett*, 358 F. Supp. 3d 1145, 1174–75 (D. Or. 2018) ("Fines, therefore, are rationally related to enforcement of traffic laws and to the deterrence of continued violations. The sting of paying a fine will hopefully prevent future unsafe driving practices. Even those who can pay the fine likely do not desire to part with their money for this reason. Methods by which the state can enforce compliance with the fine requirement, therefore, are rationally related to the safety goal. Without a compliance mechanism, the fine is toothless and without deterrent effect. Accordingly, fines are reduced to a judgment, subject to payment or collection by a number of methods, and eventually or additionally, can result in the violator's license suspension if the fine is unpaid."). *But see Robinson*, 326 F.R.D. at 154–59, *abrogated by Fowler*, 924 F.3d at 263.

The reasoning of those cases is persuasive. Even assuming it is not, the Eleventh Circuit has likewise held that a government policy can survive rational basis review even when it "may not be the best method—or may even be a poor one—for achieving [the government's] goal," so long as "it is still rational to think

that the challenged [policy] would advance the government's stated purpose." *Cook v. Bennett*, 792 F.3d 1294, 1301 (11th Cir. 2015) (reaching the same result under due process rational basis review and under the "essentially equivalent" standards of equal protection rational basis review). While license suspension for nonpayment of traffic fines may not be the best way (and may even be a poor way) to accomplish the state's goals, the challenged Rule is facially constitutional because it is rationally related to the State's legitimate interests in collecting fines, protecting public safety, and deterring traffic violations, even if it visits harsher consequences on indigent persons. Plaintiff has not made a plausible showing that "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *See Bradley*, 440 U.S. at 111.

### 2. *Procedural Due Process*

Plaintiff alleges that that Defendant's enforcement of Rule 26.11(i)(3) violated her due process rights in four ways: 1) "[n]either the court nor ALEA gave her notice that her driver's license could be suspended for nonpayment," 2) "[n]either the court nor ALEA gave her notice . . . that her ability to pay is a critical issue in determining the appropriateness of suspension," 3) "[n]either the court nor ALEA . . . conducted an ability to pay hearing prior to the suspension," and 4) her license has been suspended without a finding that she had the ability to pay. (Doc. # 1, at 9.) She argues that Rule 26.11(i)(3) is facially unconstitutional because it

authorizes suspensions without requiring the State to provide these protections. The Fourteenth Amendment provides that no State can "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).

"Suspension of issued licenses . . . involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell v. Burson*, 402 U.S. 535, 539 (1971); *see also Dixon v. Love*, 431 U.S. 105, 112 (1977). The parties agree that Plaintiff has a property interest in her driver's license. (*See* Doc. # 16, at 27; Doc. # 21, at 27 (citing *Bell*, 402 U.S. at 542).) "We thus consider whether the procedure used was constitutionally adequate." *Evans v. Rhodes*, 735 F. App'x 986, 988 (11th Cir. 2018).

Notice and hearing are distinct features of due process and are governed by different legal standards, but under either standard, Plaintiff was not deprived of due process.

### a. Notice

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The means employed must be those that would be used by one "desirous of actually informing" the interested party; a "mere gesture" is insufficient. *Id*. at 315. Plaintiff alleges that Defendant's enforcement of Rule 26.11(i)(3) inflicted two separate notice-related injuries: Defendant failed to notify her that 1) her ability to pay is a critical issue in determining the appropriateness of suspension and 2) that her license could be suspended for nonpayment.

"Plaintiff['s] characterization of the" former notice injury "is founded upon an assumption that there is a constitutional right to an indigency determination in the first place and that the rights implicated by the suspensions are" important "in a constitutional sense." *Mendoza*, 358 F. Supp. 3d at 1179. Because the Equal Protection Clause does not require the State to consider Plaintiff's ability to pay when determining the appropriateness of suspension, Plaintiff is not entitled to be notified of a non-existent right.

However, Plaintiff's second notice injury is not intertwined with her equal protection argument. Plaintiff was due some form of notice that she could be deprived of her property interest for not paying her traffic fines. However, this claim is time-barred. *See supra* Part V.C.

If this claim were timely, it remains unmeritorious because Plaintiff had statutory notice that her license could be suspended for nonpayment. *See Reams v. Irvin*, 561 F.3d 1258, 1264–65 (11th Cir. 2009) ("For one hundred years, the Supreme Court has declared that a publicly available statute may be sufficient to provide [constitutionally adequate] notice because individuals are presumptively charged with knowledge of such a statute." (alteration in original) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1239 (11th Cir. 2003))); *see also Grayden v. Rhodes*, 345 F.3d 1225, 1239 (11th Cir. 2003) (collecting cases). Plaintiff is presumptively charged with knowledge of Rule 26.11's relevant provisions: that her license was subject to suspension if she failed to pay her fines and costs, that the judge at her liability hearing should consider her ability to pay, and that he or she should consider whether to allow payment on a delayed or installment basis. *See Atkins v. Parker*, 472 U.S. 115, 130–31 (1985). The failure of this notice to inform Plaintiff of her rights to a hearing is only unconstitutional if Plaintiff has such a right, which is a separate issue. *See infra* Part V.F.2.b. If Plaintiff's non-*Bearden* notice claim were timely, it would still be subject to dismissal on the merits.

### b. Opportunity to be Heard

Plaintiff claims that she was injured because Rule 26.11(i)(3) authorizes suspensions without requiring the State to conduct an ability-to-pay hearing and/or to make a finding that she was able to pay prior to her suspension, and the State did not take either action. It has already been established that Plaintiff's license could not be taken away without due process, and "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). But "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The adequacy of the opportunity to be heard is governed by weighing the three factors set forth in *Mathews*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

The Supreme Court has held that a "driver's interest . . . in continued possession and use of his license . . . . is a substantial one." *Mackey v. Montrym*, 443 U.S. 1, 11 (1979). As stated in a similar case, there are "no reason[s] to doubt

Plaintiff['s] contention that, for many" Alabamians, "the loss of a driver's license negatively impacts individuals' ability to get to work, make doctor's appointments, go grocery shopping, and more." *Johnson*, 381 F. Supp. 3d at 639. So even though this interest is not constitutionally important, it is important to individual licensees.

Plaintiff's claim that she was unconstitutionally deprived of an opportunity to be heard on the issue of her indigency fails because *Mathews*'s second factor, the risk of erroneous deprivation, is wholly absent. Because Plaintiff's "indigency is not relevant to the State's underlying decision to suspend [her] license[], . . . giving [her] a hearing—or any other procedural opportunity—where [she] can raise [her] indigency would be pointless. Such a procedure would do nothing to prevent the 'the risk of erroneous deprivation.'" *Fowler*, 924 F.3d at 259 (quoting *Mathews*, 424 U.S. at 335).

This case is somewhat analogous to *Dixon v. Love*, where the appellee's Illinois driver's license was automatically revoked after receiving his third license suspension in ten years. *See* 431 U.S. at 117 (Stevens, J., concurring). As in *Dixon*, Plaintiff "had the opportunity for a full judicial hearing in connection with each of the traffic convictions on which the . . . decision was based." *Id.* at 113. Because Plaintiff "does not dispute the factual basis" for the decision to suspend her license for nonpayment, she "is really asserting the right to appear in person only to argue that" the Secretary or a court "should show leniency and depart from [their] own

regulations. Such an appearance might make the licensee feel that [s]he has received more personal attention, but it would not serve to protect any substantive rights." *Id.* at 114.

"The second *Mathews* factor also looks at the probative value, if any, of additional or substitute procedural safeguards." *Mendoza*, 358 F. Supp. 3d at 1180. The ability-to-pay hearing Plaintiff requests or, for that matter, any additional or substitute procedural safeguards that focused on ability-to-pay "would be unlikely to have significant value in reducing the number of erroneous deprivations," *see Dixon*, 431 U.S. at 114, when it is not erroneous for the State to fail to consider ability-to-pay.[20]

---

[20] The District of Oregon has published a persuasive explanation on the low risk of erroneous deprivation.

> There is little risk of erroneous deprivation given that the suspensions are triggered by the objective fact of nonpayment of the fines. *Mackey v. Montrym*, 443 U.S. 1, 13 (1979) (upholding license suspension based on "objective facts either within the personal knowledge of an impartial government official or readily ascertainable by him") . . . . I understand Plaintiffs' position that the risk of erroneous deprivation is high under the procedures currently used because absent the opportunity to establish indigency, Plaintiffs' fundamental rights will be wrongfully deprived. But, Plaintiffs' characterization of the deprivation is founded upon an assumption that there is a constitutional right to an indigency determination in the first place and that the rights implicated by the suspensions are fundamental in a constitutional sense. As stated previously, I disagree with Plaintiffs on this point. I do not intend my conclusion to suggest that I am blind to the fundamental effect that driver's license suspensions for nonpayment of traffic debt have on Plaintiffs' lives. I do not underestimate the adverse effects on their employment opportunities, recreational opportunities, access to medical care, and more. But, for the reasons previously explained, I do not find support in the caselaw for concluding that the

"Finally, the government has a strong interest in enforcing traffic fines to deter continuing traffic violations." *Mendoza*, 358 F. Supp. 3d at 1180. "[T]he Supreme Court has specifically recognized in the driver's license revocation context that 'the substantial public interest in administrative efficiency would be impeded by the availability of a pretermination hearing in every case.'" *Johnson*, 381 F. Supp. 3d at 644 (quoting *Dixon*, 431 U.S. at 114); *see also Mackey*, 443 U.S. at 18 (noting that increasing the number of presuspension hearings would "impose a substantial fiscal and administrative burden on the Commonwealth").

This is not to say that Alabama licensees may not be due some opportunity to be heard on the question of whether their driver's licenses should be suspended pursuant to Rule 26.11(i)(3). Indeed, *Bell* suggests that "except in emergency situations . . . due process requires that when a State seeks to terminate an interest such as [suspending a driver's license], it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective." 402 U.S. at 542 (quoting *Mullane*, 339 U.S. at 313). The Supreme Court allowed the State of Illinois to forgo a pre-deprivation hearing in *Dixon* because the drivers at issue posed a clear danger to public safety, which merited their immediate

---

rights they assert have been recognized as "constitutionally fundamental." Thus, Plaintiffs' articulation of the risk of erroneous deprivation is misplaced.

*Mendoza*, 358 F. Supp. 3d at 1179 (internal citation and footnote omitted).

removal from public roads. *See Dixon*, 431 U.S. at 114–15. But such drivers were entitled to a full evidentiary hearing upon request after their licenses were revoked. *Id.* at 109. In light of this caselaw, it is possible that Alabama licensees are at least due a process akin to the informal administrative review that Oregonians receive after their licenses have been suspended under a similar policy. *See Mendoza*, 358 F. Supp. at 1153; *see also* Ala. Code § 32-5A-195(l), (q) (providing hearing rights to individuals whose licenses have been revoked or suspended by the Secretary of ALEA for one of the authorized reasons listed in that code section); *Burlison*, 311 F. App'x at 209 (holding that due process was satisfied where the appellant "was told that he could request an administrative hearing to challenge the suspension").

The State's current policy is not wholly lacking in procedural safeguards. The fine is not imposed until the defendant has been convicted of a traffic violation by a court. And the revised ticket language informs each recipient that "[i]f you cannot pay any monetary judgment against you in 60 days, you may apply to the court to request payment of a monetary judgment in installments. You must obtain a court order approving an installment plan and provide proof of financial responsibility and such an order" to ALEA within 60 days after judgment is entered to prevent a license suspension. Ala. R. Jud. Admin. 19, Attachment One. The State's instruction that a defendant may "apply to the court" for a payment plan does provide some guidance

for how a defendant may be heard on his or her ability to pay a fine, even though it was not provided to Ms. Motley.

But the question of what other type of process might be "appropriate to the nature of the case" has not been squarely presented in this complaint. (*See, e.g.*, Doc. # 1, ¶ 22, at 7 ("There are no provisions for post-suspension process to contest the erroneous suspension of a driver's license because a person could not afford to pay the ticket.").) Plaintiff has offered no other considerations aside from ability-to-pay that require an opportunity to be heard, and any due process claim divorced from her *Bearden* claim would be untimely. *See also supra* Part V.F.1.a.1. (discussing why Plaintiff's *Turner* theory is untimely).

Ultimately, Plaintiff is not due an opportunity to be heard on her ability to pay nor is she due to receive an express finding of whether her nonpayment was willful. All of Plaintiff's claims fail on the merits.

## VI. CONCLUSION

It is therefore ORDERED that the motion to dismiss (Doc. # 14) is GRANTED and that this action is DISMISSED with prejudice. Plaintiff's motions for class certification (Doc. # 5) and for a preliminary injunction (Doc. # 3) are DENIED as moot.

Final judgment will be entered separately.

DONE this 31st day of March, 2020.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE